THE STATE OF MISSOURI, Plaintiff in Error, *v.* THE BANK OF THE STATE OF MISSOURI, Defendant in Error.

1. *The State Bank act not in conflict with section 6, article 9, of the State constitution.*—Section 6 of the act touching the State Bank (Sess. Acts 1865, p. 16) is not in conflict with section 6, article 9, of the State constitution. That the act provided that the purchase money arising from the sale of the stock held for school purposes by the State might be paid in the bonds and

The State of Missouri v. The Bank of the State of Missouri.

coupons of the State, does not necessarily make it an investment in either State bonds or obligations. The State had the undoubted right to sell, and it was responsible to the school and seminary fund for the price which it received growing out of the sale; but if it took in payment its own indebtedness, and replaced the amount in money from the treasury, there would be nothing objectionable in the transaction.

2. *Act of March 5, 1866, touching State Bank, relates to but one subject.*— The act touching the State Bank is not in conflict with section 32, article 4, of the State constitution. The reorganization of the bank, the selling of the stock, and the investment of funds were all matters intimately connected and blended, and had a natural coherence and congruity, and might be well combined in the same bill.

3. *Act touching State Bank — Sale of stock by agent appointed by the State — Authority must be strictly followed — Caveat emptor — Ratification by governor — Fact that State loses nothing, no argument for sale.*— The intention of section 5 of the act of March, 1866, touching the State Bank, was to advise the public that, up to a certain time, proposals might be made for the purchase of the stock held by the State, and that all should come in open, free, and fair competition, and to guard against unfairness and preclude the possibility of connivance and fraud. And a sale by the agent of the State, after the time advertised and without notice, amounted simply to a private sale in total disregard of the law. In such a state of facts, *held*, as follows:

1. The sale was not within the authority committed to the agent, and was not binding on the State.

2. The agency being conferred by statute and growing out of it, must be ascertained from the statute, and can not be varied or enlarged.

3. When the agent is specially appointed by the State for the sale, the purchaser is presumed to know his authority; and if he purchases in a case where that special authority is not pursued, he purchases at his peril.

4. The ratification of the sale by the governor, without the action of the Legislature, would not validate the contract. The governor himself was merely an agent, and incapable of confirming the act.

5. The fact that the purchaser was the highest bidder does not affect the case. *Non constat* but the offer, notwithstanding, was insufficient; and in that case the proposal should have been rejected and the property again advertised according to law. To sanction the doctrine that one may make a contract with a public agent in known violation of law, and then hold its benefits on the ground that the State has suffered no loss, is of modern invention, and fatal to public interests.

4. On motion to stay execution on judgment against the bank for the amount of dividends due on the stock, *held*, 1st, that said motion could not be granted on the mere suggestion of other stockholders; 2d, that the fact that third persons purchased the stock, believing that the purchaser had good title, would not avail them. He could only purchase such title as he himself possessed, and his title was acquired under a law which every person was bound to know, and construe at his peril.

The State of Missouri v. The Bank of the State of Missouri.

*Error to St. Louis Circuit Court.*

*Wingate*, for the State.

I. No valid sale of the stock in question could be made by the agent appointed to make sale thereof, under act of March 5, 1866, unless he complied strictly with the requirements of the act. The attempt on the part of Fogg to dispose of the stock without notice to the public, as required by the act, was such an abuse as rendered the whole proceeding void. (Sedgw. on Stat. and Const. Law, 347, 350–5, 687; Paley on Agency, 178–9, 202, 212–14; 8 Paige, 527; 7 Hill, 431; 26 Wend. 192; Blackf. on Tax Tit. 35–40, 54–7; Sto. on Cont. 67–8, § 70.)

II. Fogg, in receiving and reporting Eads' proposal, and in notifying Eads of its acceptance; the governor, in approving the same and transferring the stock; the treasurer, in receiving and receipting for the bonds and coupons paid by Eads, were but agents of the State charged with the performance of administrative functions, and therein powerless to dispose of the stock or bind the State, except when acting in strict accordance with the requirements of the law.

III. The act in question is a public law; and the bank, Eads, and all others claiming rights under it, are chargeable with notice of its provisions.

*H. B. Johnson*, Attorney-General, for the State.

I. The decisions upon constitutional provisions similar to ours all tend to the conclusion that the Legislature has no power to divert any portion of a common school fund from the purpose for which the same was created or appropriated, much less to dispose of such fund in a manner having the effect of depleting and destroying such fund. (Morton *et al.* v. Grenada Male and Female Academies, 8 Sm. & M. 773; State v. Trustees, etc., 11 Ohio, 24; State v. Newton, 5 Black, 445; Bush v. Chapman *et al.*, 4 Scam. 186; Trustees for Vincennes University v. State of Indiana, 14 How. 268.)

II. The sale was without notice and void. (Gibbs v. Shands,

17 Wis. 197; Gill v. Given, 4 Metc., Ky., 197; Russell v. Dyer, 40 N. H. 173; Com. Dig. 11-15; Sto. on Agency, § 165; North River Bank v. Aymar, 3 Hill, 262; Tate v. Evans, 7 Mo. 419; Denning v. Smith, 2 Johns. Ch. 244; Sto. on Agency, 307, *a*; Lee v. Monroe, 7 Cranch, 36; Curtis v. United States, 2 Nott & Hun. 144; Baltimore v. Reynolds, 2 Md. 1; State v. Hastings, 10 Wis. 518; Hull v. County of Marshall, 12 Iowa, 142; Brady v. City of New York, 20 N. Y. 312; Delafield v. State of Illinois, 26 Wend. 192; The Floyd Acceptances, 7 Wall. 666.)

III. The sale being void, it is not necessary to institute a direct proceeding to set it aside. It may be impeached collaterally.

*Glover & Shepley*, and *Burnes*, for defendant in error.

I. The transfer of the stock having been made by the governor under the act, will be held to be conclusive as to the regularity of the proceedings until the plaintiff shall by proper proceedings set the sale aside.

II. So long as the plaintiff holds possession of the consideration received for the stock, to which these dividends are an incident, it is not competent to prove that the sale was void either from irregularities in the sale or on grounds derived from the language of certain provisions of the constitution in relation to school and seminary funds.

III. But even if, as against the purchaser, the approval of the governor was not conclusive, yet the Legislature, as if to provide for the very case, inserted a provision in the act which shows that, upon the transfer being made on the books of the bank, it should be conclusive as between the bank and the State.

IV. The sale, as made (if this was a proceeding to set aside the sale as invalid), is not invalid by reason of the purchase having been made with bonds of the State of Missouri instead of treasury notes.

V. The act of the Legislature is not unconstitutional, as embracing more than one subject.

VI. The sale is not invalid by reason of any supposed irregularity of the acts of the agent. The governor is the sole and

exclusive judge of the regularity of the proceedings. Indeed, all the other acts are merely preliminary to the act of the governor, who is to decide whether a sale shall be effected or not. If this were, what it is not, a proceeding instituted to set aside this sale, yet no recovery could be had under any proof that might be adduced so long as the State has not, prior to suit, offered to return the bonds she received from the purchaser in payment of his purchase.

WAGNER, Judge, delivered the opinion of the court.

The controversy in this case grows out of the question as to who is rightfully entitled to certain dividends arising out of shares of stock of the defendant, a corporation. The facts in the case appear to be briefly these:

The plaintiff, as trustee of the school and seminary fund, and in its own right, held and owned a large number of shares of stock in the bank. On the 30th day of June, 1866, dividends on those shares were declared to the amount of $104,410.75. On the 26th day of July, 1866, the governor, and also the treasurer of the State, demanded of the bank payment to the State of the dividends due upon the stock above mentioned, and payment was refused on the ground that the stock was claimed by James B. Eads. The real contest is between Eads and the State; the bank has no interest in the question, and its answer, therefore, substantially performs the office of an interpleader. The authority whence the alleged sale to Eads took place, together with the subsequent proceedings thereon, is derived from an act of the Legislature approved March 5, 1866. (Sess. Acts 1865, p. 14.) The act is entitled "An act to authorize the Bank of the State of Missouri to reorganize as a national bank, to provide for the sale of the stock owned by this State in said bank, and to protect the seminary and common school fund and provide for its safe investment." The first three sections of the act make provision for reorganizing the State Bank into a national bank. In the event of the reorganization, the fourth section gives the governor power to appoint a competent agent in behalf of the State to sell the stock owned by the State in its

own right, and as trustee for the seminary fund and the common school fund. Section 5 declares that immediately after his appointment said agent shall proceed to cause said stock to be advertised for sale in one or more newspapers published in the cities of St. Louis, Boston, New York, and Philadelphia, for the period of not less than thirty days; and shall invite sealed proposals for the purchase of said stock, or any part thereof, and from such proposals said agent shall report to the governor those which offer in good faith the largest price and the terms most advantageous for the State; and if, in the opinion of said agent, any of said proposals so received shall appear to be the fair value of said stock, he shall mention the fact in said report; and if such proposal shall be approved by the governor, the whole or any part of said stock may be sold accordingly, in which event the person or persons submitting said proposal shall be notified by said agent of the acceptance of his or their said proposals; and within thirty days after such notice the said purchaser or purchasers shall pay or deliver to the treasurer of this State the money or other securities, as hereinafter provided, to the amount of his or their said proposals; and the treasurer shall give his duplicate receipts, one of which shall be filed with the auditor, therefor; and upon the production of this receipt the governor shall assign and transfer said stock on the books of said bank, and said bank shall issue to such purchaser or purchasers a certificate or certificates therefor, which said certificates shall be taken and considered as a complete cancellation of all claim or interest in behalf of the State, and of said several funds for which said stock is now held, and the holder or holders of such certificates shall be entitled to all the rights and privileges and subject to all the liabilities now enjoyed by the private stock-holders in said bank, or to which they are entitled; provided, however, that no such sale shall be valid until submitted to and approved by the governor in writing. The sixth section provided that the bank stock, so owned by the State, in its own right or as trustee for the seminary and school fund, should be sold only for money or the bonds of the State then due or thereafter to become due, or the coupons of any such bonds, at the option of the purchaser or purchasers.

The seventh section made it the duty of the treasurer, as soon as practicable after the sale was completed, to invest the proceeds received from the sale of the stock held for the benefit of the common school fund, and that held for the benefit of the seminary fund, in the interest-bearing bonds of the United States; and it was declared that until the same should be so invested the State should be held and considered the debtor of the said several funds, and the treasurer should pay to said several funds, out of any money then in the treasury, the interest on the full amount of the several funds, at the rate of six per cent. semi-annually.

In pursuance of the authority given in the fourth section, the governor appointed Josiah Fogg as agent on the part of the State to make sale of the stock, who caused an advertisement to be inserted in the newspapers that he would receive sealed proposals for the purchase of said stock, or any part thereof, until 12 o'clock m. of Monday, June 4th, 1866. Under this advertisement bids were received within the time limited by the terms thereof, and Fogg says that the highest was duly forwarded to the governor; but it does not appear from the record that it ever reached him, or that any action was taken upon it.

On the 12th of June, 1866, and without any notice or advertisement, according to the terms of the law, Fogg received from Eads a proposal to purchase the entire amount of the stock at the sum of $108.50 per share, payable in the bonds and coupons of the State. This proposal was certified by Fogg to the governor, with a recommendation that it be accepted, and was approved by the governor, and Eads notified in due time of its acceptance. Eads paid into the treasury the bonds and coupons, and the governor then transferred to him the certificates of stock. This transfer was dated on the 20th of July, 1866. It is admitted that the bonds and coupons still remain in the State treasury, and have never been returned to Eads. Upon the foregoing facts the Circuit Court gave judgment for the defendant, and the plaintiff prosecuted her writ of error.

It is now ᵃᵃᵇˢᵉ that the act authorizing the ____ ___ the stock was _____ _ ____ ___ invalid, because it was in conflict with section 6 ___ ___ article of

the constitution of this State; and, secondly, because it violated the thirty-second section of the fourth article of the constitution.

It is further insisted that the sale was void because the agent abused his trust in receiving the bid privately, and that he had no power whatever to receive or entertain any proposal unless it was made in compliance with law, on published notice, when the proposition was open to free competition. Several minor objections have been raised, but the above points are the main ones, and all that we deem it necessary to discuss.

The sixth section of the ninth article of the constitution provides that no part of the public school fund shall ever be invested in the stock or bonds or other obligations of any State, or of any county, city, town, or corporation; but that the stock of the Bank of the State held for school purposes, and all other stock belonging to any school or university fund, shall be sold in such manner and at such time as the general assembly shall prescribe; and the proceeds thereof, and the proceeds of the sales of any land or other property which belongs, or may hereafter belong, to such school fund, may be invested in the bonds of the United States.

By this constitutional provision, the Legislature was empowered to sell the stock held for school purposes, and invest the proceeds in the bonds of the United States; but it was prohibited from making the investment in the stock or bonds or other obligations of any State, city, town, or county corporation. That the act provided that the purchase money arising from the sale of the stock might be paid in the bonds and coupons of the State, does not necessarily make it an investment in either State bonds or obligations. The State had the undoubted right to sell, and it was responsible to the school and seminary fund for the price which it received growing out of the sale; but if it took in payment its own indebtedness, and replaced the amount in money from the treasury, I do not see that the transaction was objectionable, and it is very certain that the school fund did not suffer in consequence. It is agreed by both parties that the State has appropriated and set aside for school purposes the full amount in cash; and such bein~ '˄ ˄·˄˄. wᵉ seᵉ nᵉ rᵉᵃˢᶜnable ground of cor·ᵣ¹·˄· ·˄!˄

The next question relates to a subject which has been before this court on several occasions on cognate points. The constitution says that no law enacted by the general assembly shall relate to more than one subject, and that shall be expressed in the title; but if any subject embraced in an act be not expressed in the title, such act shall be void only as to so much thereof as is not so expressed. (Const. Mo., art. 4, § 32.)

In giving a practical construction to this section, this court has heretofore held that it was not its design to embarrass legislation by compelling a needless multiplication of separate bills, but that it was only the intention to prevent the conjoining in the same act of incongruous matters, and of subjects having no legitimate connection or relation to each other. (City of St. Louis v. Tiefel, 42 Mo. 578; State v. Matthews, 44 Mo. 523.)

In the State of New York, where a similar provision prevails, the question came up in the following manner: By the first section of "an act for the relief of the creditors of the Lockport and Niagara Falls Railroad Company," it was made the duty of the president of the corporation, or one of the directors to be appointed by the president, to advertise and sell the real and personal estates, including the franchises of the company, at public auction, to the highest bidder. It was then declared that the sale should be absolute, and that it should vest in the purchaser or purchasers of the property, real or personal, of the company, all the franchise, rights, and privileges of the corporation, as fully and as absolutely as the same were then possessed by the company. The money arising from the sale, after paying costs, was to be applied first to the payment of a certain judgment, and then to other liens, according to priority; and the surplus, if any, was to be divided ratably among the other creditors; and then, if there should be an overplus, it was to be divided ratably among the then stockholders. By the second section of the act, it was declared that the purchaser or purchasers should have the right to sell and distribute stock to the full amount which was authorized by the act of incorporation and the several amendments thereto, and to appoint an election, choose directors, and organize a corporation anew, with the same

power as the existing company.    There was then a proviso that nothing in the act should impair the subscriptions for new stocks, or the obligations or liabilities of the company which had been made or incurred in the extension of the road from Lockport to Rochester, etc.    The whole act was held to be constitutional. (Mosier v. Hilton, 15 Barb. 657.)

Now the title of the act in question was to authorize the Bank of the State of Missouri to reorganize as a national bank, to provide for the sale of the stock owned by the State in said bank, and to protect the seminary and current school fund and provide for its safe investment.    The constitution had given the Legislature power to sell the school and seminary fund, and reinvest the same.    When the authority was delegated to the bank to reorganize under the national banking system, it was deemed best to sever all State connection with it, and it was therefore necessary that the State's funds should be disposed of. The reorganization, the selling of the stock, and the investment of the funds were all matters intimately connected and blended, and had a natural coherence and congruity, and might, in my opinion, be well combined in the same bill.    The next question is, whether the agent, in receiving the private bid of Eads long after the time when proposals could be legally received under the published notice, and when competition was ended, renders the sale void.    There is no pretense that Fogg acted in compliance with the law; the counsel for the defendant does not venture to assume such a position.    The law provided that the agent, immediately after his appointment, should proceed to cause the stock to be advertised for sale, for a period of not less than thirty days, and should invite sealed proposals for the purchase of the stock, and from such proposals the agent should report to the governor those which offered in good faith the largest price, etc.    The requirements of the law are plain, and the intention is apparent.    It was to advise the public that up to a certain time proposals might be made for the purchase, and that all should come in open, free, and fair competition.    The evident design was to guard against unfairness and preclude the possibility of connivance and fraud.    But in the course pursued the law was

totally disregarded, and the transaction was simply a private sale between Fogg, the agent, and Eads, the purchaser. Is the State, as principal, bound by the act of the agent?

The rule is universal that, in order to bind the principal upon a contract made by an agent, the contract must be within the authority committed to the agent, and that the authority must be strictly followed. If the agent's acts vary substantially from his authority, in nature or extent or degree, they are void as to the principal, and do not bind him. (Com. Dig. 11, 14, 15; Sto. on Agency, § 165; North River Bank v. Aymar, 3 Hill, 262; Wahrendorff v. Whittaker, 1 Mo. 205; Tate v. Evans, 7 Mo. 419.) There is another rule founded in reason and often applied, that when the agency is created or conferred by a written instrument, and grows wholly out of it, the nature and extent of the authority must be ascertained from the instrument itself, and can not be varied or enlarged. Judge Story says if the agent exceed his special or limited authority, "the principal is not bound by his acts, but they become mere nullities so far as he is concerned." There are cases where usage, acquiescence, or ratification will vary to some extent the rules, but the principle which governs them will be hereinafter adverted to.

A party who contracts with an agent of the government, whose power is derived from, marked out, and defined by a statute, is bound to know and take notice of the agent's authority. In the case of an officer specially authorized to sell certain lands by statute, Chancellor Kent applied the rule, and held that "the special authority must be strictly pursued, and the purchaser is presumed to know that special authority, for it is contained in the act; and if he purchases in cases in which that special authority was not pursued, he purchases at his peril." (Dennings v. Smith, 2 Johns. Ch. 244; Sto. on Agency, § 307, $a$; Lee v. Munroe, 7 Cranch, 36; Curtis v. United States, 2 Nott & Hun. 144; Baltimore v. Reynolds, 2 Md. 1; State v. Hastings, 10 Wis. 518; Hull v. County of Marshall, 12 Iowa, 142.)

"By the law of agency, at the common law there is this difference between individuals and the government: the former are liable to the extent of the power they have apparently given

their agents, while the government is liable only to the extent of power it has actually given to its officers." (Per Loring, J., in Pierce v. United States, 1 Nott &. Hun. Ct. of Claims. 270.) This rule is absolutely necessary to protect the public interest against losses and injuries arising from the fraud, mistake, or rashness or indiscretion of public agents. A learned writer in 4 Am. Law Review, 1, sums up the doctrine as follows: "The first question to be asked by one who purposes contracting with the government, is whether the officer has full power to make a binding agreement; not merely whether he is a public officer, but whether, as a public officer, he is authorized to make this particular contract upon the terms proposed. Private agents, who, as agents, are held out to the public, by a well-known principle of law, will bind their principals when they act apparently within the scope of their authority. Those who deal with them are not bound in every case to examine their instructions. The presumption is that the contract was properly made, and it rests upon the principal to give notice to third persons when he means to limit his own liability. But with public agents it is essentially different. Their fundamental duties are defined by statute, and all are bound to notice the limitations to their authority. And in contracts of importance, the statute prescribes provisions and limits the expenditure. Of all this the contractor is conclusively presumed to be informed; and wherever the public agent exceeds his authority, the government is not bound by his acts."

This subject recently received a most thorough consideration in the Supreme Court of the United States, in the important case of the Floyd acceptances. The question arose whether the secretary of war could bind the United States by accepting bills of exchange without authority. The transaction was unquestionably fraudulent. The bills were drawn by army contractors, and passed into the hands of third parties without notice of the fraud. It was customary for army contractors to draw such bills upon the government for funds, but there was no authority for the custom. The court pronounced the acceptances worthless so far as the United States was concerned, and declared that under
stem of government the powers and duties of all its officers

are limited and defined by law. (The Floyd Acceptances, 7 Wall. 666.)

The case of Delafield v. The State of Illinois (26 Wend. 192; 2 Hill, S. C., 159) is in some respects like the case at bar, and in principle entirely the same. There the State of Illinois passed a law for the borrowing of money, and authorized its governor to issue and sell bonds or certificates of stock for the amount borrowed, declaring, however, that the stock should not be sold for less than its par value, and empowering the governor to appoint agents to effect the loan; and a loan was effected upon the terms that the money should be paid by installments and at deferred periods, but that the interest should commence immediately upon the whole sum; and certificates of stock were issued and delivered to the lender. It was held by the Court of Errors that the contracts were not obligatory upon the State, because the agents had exceeded their authority: first, in selling the stock upon credit; and, secondly, in agreeing that the interest should commence running previous to the advance of the money, thus virtually selling the stock for less than its par value, and that therefore the State was entitled to a return of the certificates of stock. It was further held that the approval by the governor of the acts of his agents, the receipt and appropriation of a portion of the proceeds of the certificates, and other acts of acquiescence of executive officers of the State, were not enough to amount to a ratification of the contracts; that they could be ratified only by the Legislature; and as it appeared that the Legislature disavowed the contracts and took measures to recover back the certificates, all pretense of ratification failed. And it was also said by the court that consent or ratification of the doings of the agent might be presumed from the acts or omissions of the principal. Where, however, a State was the principal, acts and omissions, which in the case of an individual would be deemed sufficient to authorize the presumption, would not be so held.

As a further illustration of the invalidity of contracts made by an officer or agent, where he has not pursued strictly the power under which he assumes to act, reference may be had to the case

of Brady v. The City of New York, 20 N. Y. 312. That was a case where certain work was let out to be done by the street commissioners, whose duty it was, under the law, to advertise and receive proposals for the same. The law prescribing the manner in which bids should be received was as follows : "All work to be done and all supplies to be furnished for the corporation, involving an expenditure of more than $250, shall be by contract, founded on sealed bids, or on proposals made in compliance with public notice for the full period of ten days ; and all such contracts, when given, shall be given to the lowest bidder, with adequate security."

The bid was not made in conformity with the law, though it was accepted, and the party proceeded and performed the work. Afterwards the common council confirmed the illegal contract; but the court held that the contract was void, and that the confirmation did not give it any validity as against the corporation.

The act amending the charter of the city of New York, said Denio, J., " established a system by which all work to be performed for the city, which should cost more than $250, should be subjected to public competition, and should be given out to the party who would undertake to do it for the smallest amount of money. It was based upon motives of public economy, and originated, perhaps, in some degree of distrust of the officers to whom the duty of making contracts for the public service was committed. If executed according to its intention, it will preclude favoritism and jobbing, and such was its obvious purpose. It does not require any argument to show that a contract made in violation of its requirements is null and void." And again, the learned judge continued : " The action of the common council, in confirming the assessment roll, can not aid the plaintiff upon any principle with which I am acquainted. That body could not make the contract originally ; and if a lawful one has not been made by the officer to whom that duty was committed by law, it can not be helped out by any resolution of the council."

It is insisted in argument that the approval of the governor was conclusive, and that we can not go behind his action ; but this is preposterous. The State, by her legislative act, expressly

prescribed the manner in which the stock should be advertised and sold. The reasons why the terms in a case like this should be literally complied with, readily suggest themselves to every mind. The agent violated the requirements of the act. The governor himself was but an agent, and he would have had no power to make the contract in the manner pursued by Fogg; and he was therefore incapable of confirming or ratifying it. (The People v. The Phœnix Bank, 24 Wend. 431, and cases hereinbefore referred to.) Nothing short of an express act of the Legislature can validate a contract made in contravention of a statutory law. Nor can it be said that the State has acquiesced in the contract; for immediately after it was consummated the attorney-general, the law officer of the State, commenced this proceeding, claiming that it was utterly void. In this he was sustained by the Legislature, for that body passed a resolution authorizing him to continue the prosecution.

But it is contended that the contract should be upheld because the State lost nothing by it; that the last bid upon which the sale was made was higher than any proposal received by the agent when they were regularly put in. Eads, it is said, made the highest proposition when proposals were being received under the published notice up to the 4th of June; and after that time, when the agent was no longer acting under any recognized authority, he privately advanced the rate, and the last was accepted. The answer to this is, that the simple fact that the first proposal was made was no evidence that the person making it would thereby obtain the stock. If the offer was not sufficient and did not amount to a fair valuation, the duty of the agents acting for the State was plain: they should have promptly rejected the proposals and proceeded again to advertise, in accordance with the law, and opened the matter up to a fair rivalry and free competition. Besides, this doctrine that a person may make a contract with a public agent in known violation of law, and then hold its benefits on the ground that the State has suffered no loss, is purely of modern invention, and finds no support in the rugged and sturdy principles of jurisprudence, as they were formerly recognized. To sanction such a thing would be destructive and fatal to

the public interests. It would be, indeed, establishing a pretty precedent. Upon every view of the case the contract must be held void. The agent had no authority for his action; this fact was known to Eads; the law was before them both.

The judgment of the Circuit Court must therefore be reversed, and final judgment entered in this court for the plaintiff. The other judges concur.

On motion to modify judgment, WAGNER, Judge, delivered the opinion of the court.

The counsel for the defendant appears, and moves this court to modify the judgment heretofore rendered in this cause by adding thereto an order that no execution shall be issued thereon until sixty days after the meeting of the next general assembly of this State. The reasons assigned for the motion are that the sale of the stock in the bank, owned by the State and held by her, to James B. Eads, is declared by the decision to be void, and that the State is entitled to recover of the defendant the dividends upon the stock in July, 1866; and that, as the governor transferred to Eads, upon the books of the defendant, the said shares of stock in said bank, held by the State, which transfer the defendant could not control, and had no means of preventing; and as Eads, shortly after the sale and transfer of the stock to him, sold for value, and transferred on the books of the bank to third persons, most of the shares, which persons were without any knowledge or notice or reason to believe that the sale was in any manner illegal — the defendant, in consequence of the sales and transfers aforesaid, now finds itself in the position to be subject to a suit by the State for the dividends on the stocks earned subsequent to the dividends which were the subject-matter of this suit, and which dividends subsequently earned have been paid over to Eads and the purchasers from him; and that the defendant is also subject to a suit both by the State and by said Eads, and the purchasers from him, for dividends which shall hereafter accrue.

It is then further stated that the State still holds the bonds and coupons paid by Eads for the purchase of the stock, and that he

will apply to the next Legislature to rescind the sale and recover back the bonds ; that the interest of the stockholders (other than those owning the shares of stock in controversy) are seriously affected by a controversy which neither they nor the bank are parties to, or have anything to do with, and against the consequences of which they can not protect themselves.

As regards the last proposition, it is not perceived upon what grounds the interference of this court can be invoked. The stockholders stand in the exact situation of any other parties whose interests are incidentally affected by proceedings in which they do not appear of record. But it was never supposed that the course of justice should be stayed or judgment arrested in consequence thereof upon their mere suggestion. I know of no principle or precedent to justify such a course.

And the first reason included in the motion is equally untenable. That third persons purchased the stock, believing that Eads had a good title, will not avail them in this case. Eads could only transfer such title as he himself possessed, and his title was acquired under a law which every person was bound to know and construe at his peril. The statute under which the sale was had was a public act, and imparted notice to all. The bank does not aver ignorance or want of notice in these purchasers from Eads, but only states the fact so far as it knows. It is no ground to interfere now, because the bank fears that it may be subjected to future litigation and liability. We speak of the bank only, because it alone is a party to the record, and we can notice no other person as having a standing here. The bank was apprised of the circumstances attending the sale, and knew that the State claimed the dividends, and that the suit was instituted asserting the invalidity of the sale. Its proper course, then, before it paid anything, would have been to have the rights of the parties adjusted by an interpleader. Whatever may be the existing equities between the State and the party to whom the stock was transferred, we can not undertake to decide.

The State, as much as a private person, is bound in faith and honor to do justice ; but we have no authority to impose terms and conditions upon her. To attempt to arbitrarily stay an

execution, under the circumstances of this case, and upon the suggestion that parties not of record may be affected thereby, would be setting a most dangerous precedent, and would be entirely unauthorized.

The motion will be overruled. The other judges concur.