74 U.S. 666 (____)
7 Wall. 666
THE FLOYD ACCEPTANCES.
Supreme Court of United States.

*670 *671 Messrs. Black, Curtis, and Gooderich, for the appellants.
Mr. Evarts, Attorney-General, and Mr. Dickey, Assistant Attorney-General, contra, contended.
*673 *674 Mr. Justice MILLER delivered the opinion of the court.
The cases before us are demands against the United States, founded upon instruments claimed to be bills of exchange, drawn by Russell, Majors & Waddell, on John B. Floyd, Secretary of War, and accepted by him in that capacity; purchased by plaintiffs before maturity, for a valuable consideration, and, as they allege, without notice of any defence to them.
Mr. Pierce, in his petition, relies on the facts that the signature of John B. Floyd, to these acceptances, is genuine, and that he was at the time of the acceptance Secretary of War, as sufficient to establish his claim. He avers that Floyd, as Secretary of War, had authority to accept the drafts, and that by his acceptance the United States became bound. It is evident that he means by this merely to assert, as a principle of law, that, by virtue of his office, the secretary had such authority, and not that there existed, in this case, special facts which gave such authority; for he mentions no such facts in his petition, and when the solicitors for the defendant undertook to show under what circumstances the bills were issued and accepted, he objected to the evidence. Its admission is one of the alleged errors on which he brings the case to this court.
Both Mr. Pierce and his counsel, therefore, claim to recover on the doctrine that when a party produces an instrument in the form of a bill of exchange, which he has purchased before its maturity, drawn on the Secretary of War, and accepted by him, he has established a claim against the government which admits of no inquiry into the circumstances under which the acceptance was made.
The other defendants, also, in their original petitions, assert and rely upon the same principle; but they have also filed amended petitions, in which they set forth facts connected with the acceptance of the secretary, which they *675 deem sufficient to establish his right or authority to accept. Most of the facts, found under the issues made by these amended petitions, were also found under the general issue in Pierce's case, notwithstanding his objection; so that, if they avail the other plaintiffs, they will also support his claim.
It will be convenient, therefore, to consider, first, the proposition on which he rests his case, which, if found to be sound, disposes of all the cases in favor of plaintiffs.
One of the main elements of that proposition, much and eloquently urged upon our attention, seems to be too well established by the decisions of this court, to admit now of serious controversy. It must be taken as settled, that when the United States becomes a party to what is called commercial paper  by which is meant that class of paper which is transferable by indorsement or delivery, and between private parties, is exempt in the hands of innocent holders from inquiry into the circumstances under which it was put in circulation  they are bound in any court, to whose jurisdiction they submit, by the same principles that govern individuals in their relations to such paper.
Conceding, then, for the sake of argument, that the instruments under consideration are, in form, bills of that character, and that the signature of Floyd is genuine, and that he was at the time Secretary of War, there remains but one question to be considered essential to plaintiffs' right to recover, and that concerns the authority of the secretary to accept the bills on behalf of the government.
It is not to be denied, that in the extensive and varied fiscal operations of the government, bills of exchange are found to be valuable instruments, of which it has the right to avail itself whenever they may be necessary. In the transfer of immense sums of money from one part of the country to another, and in the payment of dues at distant points, where they should properly be paid, it uses, as it ought to use, this time-honored mode of effecting these purposes.
In the case of such paper, issued by an individual, when *676 we make ourselves sure of his signature, we are sure that he is bound, because the right to make such paper belongs to all men. But the government is an abstract entity, which has no hand to write or mouth to speak, and has no signature which can be recognized, as in the case of an individual. It speaks and acts only through agents, or more properly, officers. These are many, and have various and diverse powers confided to them.
An individual may, instead of signing, with his own hand, the notes and bills which he issues or accepts, appoint an agent to do these things for him. And this appointment may be a general power to draw or accept in all cases as fully as the principal could; or it may be a limited authority to draw or accept under given circumstances, defined in the instrument which confers the power. But, in each case, the person dealing with the agent, knowing that he acts only by virtue of a delegated power, must, at his peril, see that the paper on which he relies comes within the power under which the agent acts. And this applies to every person who takes the paper afterwards; for it is to be kept in mind that the protection which commercial usage throws around negotiable paper, cannot be used to establish the authority by which it was originally issued. These principles are well established in regard to the transactions of individuals. They are equally applicable to those of the government. Whenever negotiable paper is found in the market purporting to bind the government, it must necessarily be by the signature of an officer of the government, and the purchaser of such paper, whether the first holder or another, must, at his peril, see that the officer had authority to bind the government.
When this inquiry arises, where are we to look for the authority of the officer?
The answer, which at once suggests itself to one familiar with the structure of our government, in which all power is delegated, and is defined by law, constitutional or statutory, is, that to one or both of these sources we must resort in every instance. We have no officers in this government, *677 from the President down to the most subordinate agent, who does not hold office under the law, with prescribed duties and limited authority. And while some of these, as the President, the Legislature, and the Judiciary, exercise powers in some sense left to the more general definitions necessarily incident to fundamental law found in the Constitution, the larger portion of them are the creation of statutory law, with duties and powers prescribed and limited by that law. It would seem reasonable, then, that on the question of the authority of the Secretary of War to accept bills of exchange, we must look mainly to the acts of Congress.
The counsel for claimants, not altogether rejecting this view of the matter, maintain that the power is derived 
1st. From the true construction of the Constitution and acts of Congress.
2d. From the decisions of the Supreme Court of the United States; by which is probably meant only the authoritative construction of the Constitution and laws.
3d. From the usage of the government in similar cases.
We will examine these several alleged sources of the power in the reverse order to that here stated.
1. As regards usage, it must occur at once that if there are instances in which the use of bills of exchange by the officers of government is authorized by law, as undoubtedly there are, the use of them in such cases, however common, cannot establish a usage in cases not so authorized. It may also be questioned whether the frequent exercise of a power unauthorized by law, by officers of the government, can ever by its frequency be made to stand as a just foundation for the very authority which is thus assumed.
It is to be observed in this connection, that the Court of Claims finds as a fact, in Pierce's case, that "the evidence fails to establish any usage or practice in the different departments of the government, by virtue of which the Secretary of War was authorized to accept, in behalf of the United States, the bills in suit;" and so far as that case is concerned this inquiry might close there.
*678 But in the finding of facts which the same court makes in the other three cases, it is said, "That it is, and has been the practice of the heads of departments, to accept drafts or bills of exchange for the transmission of funds to disbursing officers, or the payment of those serving in distant stations, or for services rendered." The usage here found is limited to specified classes of cases, and if authorized by law, can be no evidence of a usage in cases not so authorized. It cannot be held to support the allegation of a usage so general as to apply to any case in which the head of the department may see proper to use it.
We make the further observation in this connection, that while it is readily to be seen that the exigencies of the business of the departments may require drafts to be drawn by them, and may justify drafts being drawn on them, which they ought to and do pay when presented, there can be no occasion for an acceptance by any department or officer of a draft drawn on either of them.
We do not think, therefore, that usage is a sufficient reliance as an authority for the acceptance of these drafts.
2. The United States v. Bank of the Metropolis,[*] is the case mainly relied on as establishing the doctrine contended for by plaintiffs, and is confidently asserted to be conclusive of the cases under consideration, unless overruled.
That case undoubtedly did decide, that when an officer of the government, authorized to do so, accepted a draft in behalf of the United States or one of the departments, the validity of the instrument could not be disputed in the hands of an innocent holder. We have already stated this as the established doctrine of this court. And that proposition was the principal, if not the only one, controverted in that case. An attentive examination of it will show that the authority of the officers to accept was not raised by counsel or considered by the court.
The Bank of the Metropolis being sued for certain balances in favor of the United States, pleaded as a set-off a *679 draft drawn by Edwin Porter on Richard C. Mason, Treasurer of the Post Office Department, at ninety days, and accepted by him as Treasurer; and also four drafts at ninety days, drawn by James Reeside on Amos Kendall, Postmaster-General, and "accepted on condition that his contracts be complied with."
It does not appear to have been controverted that Mason had authority to accept the draft of Porter, by either the counsel for the government or the bank; and the court seem to have treated it as conceded.
The opinion of the court, after stating the facts, opens with the declaration that, "when the United States, by its authorized officer, becomes a party to negotiable paper, they have all the rights, and incur all the responsibilities of individuals who are parties to such instruments." And further on it is said, that "an unconditional acceptance was tendered to it (the bank) for discount;... . all it had to look to was the genuineness of the acceptance, and the authority of the officer to give it." If this language has any significance, it is that the authority of the officer, like the genuineness of the signature, is always to be inquired into at the peril of the party taking an acceptance purporting to bind the government.
Only a small part of that elaborate opinion is devoted to Porter's draft, and to the questions involved in it, and the remainder of it is occupied in discussing the effect of the condition annexed to the acceptance of Reeside's draft on its commercial character, and to determining what is implied in that condition.
It seems, therefore, quite clear that no consideration whatever was given by the court to what constituted an authority to draw or accept bills of exchange; but that it was impliedly held to be a matter always open to inquiry when the draft was attempted to be enforced against the government. Nor are we aware of any case in this court in which the rule for determining that authority has been laid down.
Recurring, then, to the written law as the exclusive source of such authority, we may confidently assert that there is no *680 express authority to any officer of the government to draw or accept bills of exchange.
Our statute books are filled with acts authorizing the making of contracts with the government through its various officers and departments, but, in every instance, the person entering into such a contract must look to the statute under which it is made, and see for himself that his contract comes within the terms of the law.
Does the contract, called a bill of exchange, stand on any different footing? It is true, that when once made, by a person having authority to make it, in any given case, it is not open to the same inquiries, in the hands of a third party, that ordinary contracts are, as to the justice, fairness, and good faith which attended its origin, or any of its subsequent transfers; but, in reference to the authority of the officer who makes it, to bind the government, it is to be judged by the same rule as other contracts.
The authority to issue bills of exchange not being one expressly given by statute, can only arise as an incident to the exercise of some other power. When it becomes the duty of an officer to pay money at a distant point, he may do so by a bill of exchange, because that is the usual and appropriate mode of doing it. So, when an officer or agent of the government at a distance, is entitled to money here, the person holding the fund may pay his drafts. And whenever, in conducting any of the fiscal affairs of the government, the drawing a bill of exchange is the appropriate means of doing that which the department, or officer having the matter in charge, has a right to do, then he can draw and bind the government in doing so. But the obligation resting on him to perform that duty, and his right and authority to effect such an object, is always open to inquiry, and if they be found wanting, or if they be forbidden by express statute, then the draft or acceptance is not binding on the government.
It cannot be maintained that, because an officer can lawfully issue bills of exchange for some purposes, that no inquiry can be made in any case into the purpose for which a *681 bill was issued. The government cannot be held to a more rigid rule, in this respect, than a private individual.
If A. authorizes B. to buy horses for him, and to draw on him for the purchase-money, B. cannot buy land and bind A., by drawing on him for the price. Such a doctrine would enable a man, in private life, to whom a well-defined and limited authority was given, to ruin the principal who had conferred it. So it would place the government at the mercy of all its agents and officers, although the laws under which they act are public statutes. This doctrine would enable the head of a department to flood the country with bills of exchange, acceptances, and other forms of negotiable paper, without authority and without limit. No government could protect itself, under such a doctrine, by any statutory restriction of authority short of an absolute prohibition of the use of all commercial paper.
In accordance with these views, we are of opinion that, as there can be no lawful occasion for any department of the government, or for any of its officers, or agents, to accept drafts drawn on them, under any statute or other law now known to us, such acceptances cannot bind the government.
An examination of the facts found by the Court of Claims, confirms the views already stated.
Counsel for the plaintiffs seem to have been of the opinion, from the start, that there was nothing in the nature of the transaction which would support the paper on which they sued, for they steadily resisted all efforts on the part of government to give the facts in evidence; and in the arguments made in this court, the right to recover is rested almost exclusively on the proposition that, because in some cases the secretary might lawfully accept, it must be presumed in their favor that these drafts were lawfully accepted.
It seems to us that such a transaction can be defended on no principle of law, and that, in thus lending to Russell & Co. the name and credit of the United States, the secretary was acting wholly beyond the scope of his authority. The paper was, in fact, accommodation paper, as it was found to *682 be by the Court of Claims, by which the secretary undertook to make the United States acceptor for the sole benefit of the drawers. It was a loan of the credit of the government volunteered by him, without consideration and without authority. That the transaction was not payment, nor intended to be payment, for the supplies furnished, is clear, because the acceptances were not expected to be paid by the government, nor payable at the treasury, but were to be met by the drawers at the bank with which they dealt. These drafts did not interrupt in the least the regular payments made to Russell & Co. by the Quartermaster's Department, according to their contracts. Nor do the drafts seem to have had any relation to anything due on these contracts, or to what might become due before their maturity. It was, therefore, not payment, nor so considered by either party.
But if these acceptances can be considered as payments, they were payments in advance of the service rendered and supplies furnished  payments made before anything was due. They are in that view not only without authority of law, but are expressly forbidden by the act of January 31, 1823.[*] The first section of that statute, which has never been repealed, enacts "that, from and after the passing of this act, no advance of public money shall be made in any case whatever; but in all cases of contracts for the performance of any service, or the delivery of articles of any description for the use of the United States, payment shall not exceed the value of the services rendered, or the articles delivered previous to such payment."
The transaction by which these drafts were accepted was in direct violation of this law, and of the limitations which it imposes upon all officers of the government. Every citizen of the United States is supposed to know the law, and when a purchaser of one of these drafts began to make the inquiries necessary to ascertain the authority for their acceptance, he must have learned at once that, if received by Russell, *683 Majors & Waddell, as payment, they were in violation of law, and if received as accommodation paper, they were evasions of this law, and without any shadow of authority.
It is proper to observe, that it does not appear from this record, that anything remains due to Russell & Co., under their contract with the government, or that anything was due them at the maturity of any of these drafts, nor is there any attempt on the part of plaintiffs to show either of these things, or the state of the accounts between those contractors and the government at the time the drafts matured
These cases have long been before the departments, before Congress, and the Court of Claims, and have been the subject of much laborious consideration everywhere. The amount involved is large, the principles on which the claims are asserted, are, to some extent, new, and we have given them a careful and earnest investigation. We are of opinion that the judgments rendered by the Court of Claims against the plaintiffs, must be
AFFIRMED.
Mr. Justice NELSON (with whom concurred GRIER and CLIFFORD, JJ.) dissenting:
I am unable to concur in the opinion just delivered.
The instruments, in the form of bills of exchange, drawn by Russell, Majors & Waddell, upon, and accepted by Floyd, Secretary of War, were drawn on "account of our contract for supplies for the army in Utah," or "on account of our transportation contract of the 12th April, 1860."
These are not bills of exchange, in the sense of the law merchant, or possessing the properties of negotiable paper. They are drawn upon a particular fund, in terms which may or may not be sufficient to pay the bills, and hence a contingency exists whether or not they will be paid at maturity. All the cases agree that the money mentioned in the instrument must be payable absolutely and at all events, and not made to depend on any uncertainty or contingency.[*]
*684 The instruments not being negotiable, the assignees or holders taking them, are subject to all the equities that may exist between the acceptor and the drawer, and stand in no better position, in the present case, than Russell, Majors & Waddell. As between these parties and the government, the obligation assumed by Floyd, as representing it by his acceptance, was to account and to apply all the moneys due, or that might become due on the contracts for transportation or supplies, specified in the bills or drafts, at their maturity. To this extent the government became bound to the contractors, or to the assignees or holders of the same; and as the acceptance by the secretary assumes or implies that there were some funds due, or might become due on the contracts in his hands, subject to these drafts, the onus was on the government to give evidence of the amount, or to state the account with the drawer, so as to ascertain the amount due, if any. This evidence was peculiarly in the power of the government. As no such adjustment has been made, for aught that appears, the government may now have in its hands moneys belonging to these contractors, to pay the drafts.
I am of opinion, also, that under the sixth section of the act of May 1, 1820, it was competent for the Secretary of War to accept bills of exchange in behalf of these contractors, and that if the bills in question had possessed negotiable properties, the government would have been bound to a bonâ fide holder for value.
That section provides, "that no contract shall hereafter be made by the Secretary of State, or of the Treasury, or of the Department of War, or of the Navy, except under a law authorizing the same, or under an appropriation adequate to its fulfilment; and excepting, also, contracts for the subsistence and clothing of the army or navy, and contracts by the Quartermaster's Department, which may be made by the secretaries of those departments."
It will thus be seen that contracts for the subsistence and clothing of the army and navy, by the secretaries, are not tied up by any necessity of an appropriation or law authorizing *685 it. The reason of this is obvious. The army and navy must be fed, and clothed, and cared for at all times and places, and especially when in distant service. The army in Mexico or Utah are not to be disbanded and left to take care of themselves, because the appropriation by Congress, for the service, has been exhausted, or no law can be found on the statute book authorizing a contract for supplies. The above act confers upon the secretaries full authority to contract for these supplies, and which bind the government; and the most ready and convenient mode of accomplishing this, would be by accepting bills of exchange drawn by the contractors of the distant army or navy, upon the secretaries at home.
The credit of the government, thus pledged, would at once furnish the necessary subsistence, clothing, and shelter.
Our conclusion is, that the judgment below should be reversed, and the cause remitted, with directions to grant a new trial, and further proofs taken, that complete justice may be done between the parties.
NOTES
[*] 15 Peters, 377.
[*] 3 Stat. at Large, 723.
[*] 3 Kent's Com. 76-7, and notes; Story on Bills of Exchange, § 46.