Drake, Ch. J.,
dissenting:
I do not concur in the opinion just read, and deem the case of sufficient importance to justify an extended expression of the views which compel my dissent. Its importance is not less in its large amount than in the value of stability and uniformity in judicial decisions.
One of the foundation-stones of common-law jurisprudence is the maxim' stare decisis ; a maxim not blindly to be adhered to regardless of .circumstances, but still of great virtue and lasting value. No court can safely disregard its general influence, though every court may, and ought, when satisfied of the error of its previous decisions, to overleap the barriers of the rule, and correct its own mistakes.
In this case I adhere to the maxim, because I believe the precedents made by the unanimous judgment of this court in cases similar to this, none of. which were appealed from, were eminently sound, and ought not to be unsettled.
The first point to be considered is as to what statute governs the case. Without doubt it is either the tenth section of the Act of March 2,1861, (12 Stat. L., 220,) or the fourth section of the Act of July 4, 1864, .(13 Stat. L., 394.)
The former is in these words: “ That all purchases and contracts for supplies or services, in any of the Departments of the Government, except for personal services, when the public exigencies do not require the immediate delivery of the article or articles or performance of the service, shall be made by advertising a sufficient time previously for proposals respecting the same. When immediate delivery or performance is *200 required by the public exigency, the articles or service required may be procured by open purchase or contract, at the places and in the manner in which such articles are usually bought and sold, or such services engaged, between individuals.”
The latter is iu the following words: u That when an emergency shall exist, requiring the immediate procurement of supplies for the necessary movements and operations of any army or detachment, and when such supplies cannot be procured from-any established depot of the Quartermaster’s Department, or from the head of the division charged with the duty of furnishing such supplies, within the required time, then it shall be lawful for the-eommanding officer of such army or detachment to order the chief quartermaster of such army or detachment to procure such supplies during the continuance of such emergency, but no longer, in the most expeditious manner, and without advertisement; and it shall be the duty of such quartermaster to obey such order 5 and his accounts of the disbursements of moneys for such supplies shall be accompanied by the order of the commanding officer as aforesaid, or a certified copy of the same, and also by a statement of the particular facts and circumstances, with their dates, constituting such emergency.”
It is not, in my opinion, any longer an open question in this court as to which of those statutes controls this case. I consider that settled by our judgment in Cobb, Christy & Co.’s Case, (7 C. Cls. R., p. 470,) which, like this, grew out of transactions of the Quartermaster Department of the army of the Cumberland, simultaneously with those herein involved. The two cases bring into view the same officers and the same general condition of military affiairs in Tennessee between December, 1864, and April 10,1865; and both are connected with the last-named date, when the fall of the rebel city of Bichmond at once broke the power of the rebellion, and dispensed with the necessity of further extraordinary efforts to sustain the armies of the Union engaged in its suppression.
In that case the court, without dissent, held that the Act of July 4, 1864, exclusively, and not that of March 2, 1861, controlled ; and the grounds of that decision seem to me incapable of question.
But even if it should be supposed that the Act of March 2, 1861, bears upon this case, still, under the ruling of this court *201 in McKinney’’s Case, (4 C. Cls. R., p. 537,) these claimants could not recover. That was a case of a contract entered into on the 1st of December, 1864, for the delivery of wood from the 1st of March to the 1st of May, 1865. It was entered into by the authority of the chief quartermaster of the Army of the Cumberland, without advertisement for proposals; and in reference to it the court said: “ It was made for a future supply, and on the authority of the chief quartermaster of General Thomas’s army, and is thus within the prohibition of the Act of March 2, 1861.”
Treating this case as governed exclusively by the Act of July 4, 1864, I hold that the following positions in regard to that act are not only tenable, but have been taken by this court without dissent, and without appeal to the higher court:
I. That to the commanding officer of the army or detachment is left the question of the existence of the emergency authorizing the immediate procurement of supplies, without advertisement. (Henderson’s Case, 4 C. Cls. R., p. 75.)
II. That he is the sole judge of when the emergency exists. (Baker & Folsom’s Case, 3 C. Cls. R., p. 343; Emery & Blake’s Case, 4 ibid., p. 401; Wilcox’s Case, 5 ibid., p. 386.
III. That his orders in the premises are, as to the existence of the emergency, conclusive upon the officers charged with obtaining the supplies. (Henderson’s Case,ut supra.)
IY. That without his order a quartermaster would have no lawful authority to contract without advertisement for future supplies. (Henderson's Case and Emery & Blake’s Case, ut supra.)
Y. That the commanding officer’s authority to give an order for the immediate procurement of supplies, without advertisement, continues only so long as the emergency exists. (Emery 6 Blake’s Case, ut supra.)
VI. That under such an order the supplies must be obtained in “ the most expeditious manner.” (Cobb, Christy & Co.’s Case, 7 C. Cls. R., p. 470.)
VII. That under such an order a contract could not be made extending beyond the period of the existence of the emergency. (Emery & Blake’s Case, ut supra.)
VIII. That he who contracts with a quartermaster for the delivery of supplies, without advertisement and proposals, “ is bound to inquire and know whether the proper commanding *202 officer has declared the exigency, and authorized the officer making the contract to dispense with the usual safeguards which the laws of Congress have thrown around the operations and engagements of subordinate officers and agents.” On this point the language of the court was emphatic, as follows:
“ It is a fact easily ascertained; and, as it furnishes the very foundation and authority of a subordinate officer to make contracts or purchases in a particular manner, there is no hardship in requiring persons dealing with such officer to first ascertain whether he has the requisite legal authority to enter into the proposed stipulations and obligations for the United States. So much is required of all persons dealing with an agent. Whenever a bargain or transaction out of the ordinary usages of trade is proposed by an agent or factor, the first duty of the other party is to satisfy himself that the agent has authority from his principal to enter into the proposed stipulations. If he fail to do so, he takes all the risk of the agent’s authority upon himself. There is every reason, where the law has prescribed definitely and precisely, as here, the evidence of the public agent’s power and authority, to apply, the same rule.” (Henderson’s Case, ut supra.)
Such are, in condensed form, the positions taken by this court in its construction of the Act of July 4,1864. I hold them all to be sound and incontrovertible, and, as yet, they are unopposed by any ruling of the appellate court. In view of them, I can see no way to render a judgment in favor of the claimants in this case, for the following reasons:
1. Ho order was given by General Thomas to his chief quartermaster on or before March 9, 1865, to. procure one thousand mules to meet a then-existing emergency.
2. In the absence of such an order from him, this court cannot judicially determine that an emergency existed, requiring the procurement of that or any other number of mules by exec-utory contract, without advertisement.
3. That the authority given by General Donaldson’s approval, indorsed on Captain Howland’s letter of March 8, 1865, allowing him to offer and give higher prices for mules. than those previously paid, did not authorize Howland to make the contract sued on.
4. That the claimants were bound to inquire and know whether General Thomas had given an order which would *203 legally authorize the procurement, without advertisement, of that number of mules.
5. That the paper signed by Howland, even supposing a previous order to have been given by General Thomas to procure one thousand mules to meet an emergency, showed by its very terms that it could not have been intended to meet that order, for it did not require any mules at all to be delivered, but only agreed to receive one thousand mules if delivered on or before the 20th of April, 1865 ; and because, even if it should be held to require such a delivery, there was no requirement to deliver a single mule.before that day, which was forty-two days after the date of the contract; but the contract, being for the delivery of one thousand mules on or before that day, would have been fulfilled if the whole number had been delivered on that day; which wholly disproves the idea of an emergency, as was substantially held under similar circumstances in McKinney’s Case, ut supra.
6. That the uniform practice of the Quartermaster Department of the Army of the Cumberland, for months prior to this contract, of buying supplies in open market, without advertisement, however it may have been tacitly approved by General Thomas, as “the most expeditious manner” of supplying the urgent needs of his Army, could not justify a contract of this description for future supplies. “Immediate procurement of supplies for the necessary movements and operations of an army” does not mean a contract for delivery at the end of forty-two days; nor does obtaining supplies “in the most expeditious manner ” mean, presumably, contracting for them at that long range. In such a case, present, instant procurement, if possible, and if not, procurement as nearly present and instant as practicable, is what the act requires. In an emergency requiring such an order, a contract for the delivery of supplies at the end of forty-two weeks would seem hardly less inconsistent with the circumstances than one for delivery at the end of so many days.
7. If it be supposed that the acceptance by the assistant-quartermaster who succeeded Howland of the twenty-four mules delivered to him by the claimants under the contract was a ratification of the contract by the defendants, entitling the claimants to recover in this action, it seems to me that the all-sufficient answer is, that neither an agent transcending his *204 authority in the making of a contract, nor a succeeding agent of the same grade and powers, can, by his own act alone, ratify the contract so as to bind the principal. 1
There is no pretense here of any ratification except of that description. It does not appear that General Donaldson, or any other superior officer, ratified it. So far, then, as binding the Government is concerned, we have nothing of ratification to look to but the acts of the assistant quartermaster who succeeded Howland. If we should charge the Government upon the basis of those acts alone, the Government would always be at the mercy of its subordinate officers, however unlawful their acts might be.
Beyond doubt, as this court has repeatedly, and in my judgment most justly, held, the Government, however illegal and void the contract, ought to pay the value of whatever was received and used by it under the contract. But that is not the question here; for the mules delivered to and received by How-land’s successor have been paid for. The question is whether the Government shall respond in damages for the refusal to accept other mules when the contract was unlawfully entered into. In my view, no act of the officer who made the contract, or of his successor, is such a ratification by the Government as subjects it to such liability.
8. It is, however, claimed that, under the ruling of the Supreme Court in Speed’s Case, (8 Wall., p. 77,) the contract was, in fact, lawful, and that therefore the decisions of this court, above cited, construing the Aet J.uly 4, 1864, do not apply. To this view there are, to my mind, two insuperable objections: 1. That in that case the contract was made by the War Department, and not by an officer in the field, and therefore did not at all come within the purview of the Aet July 4, 1864, but was directly governed by the Act March 2, 1861; . and, 2. That the Supreme Court decided the case expressly under the Aet 1861, and did not, in the most distant manner, allude to the Aet 1864; following in that respect the course of this court, as appears by the report of the case in 2 C. Cls. R., p. 429.
The difference between the purpose and scope of those acts was fully considered and deliberately stated by this court in Cobb, Christy & Co.’s Case, where we held, on the one hand, that the Act 1864 was enacted in the civil war, and for it; *205 that its purpose was to reconstruct the Quartermaster Department, to adapt it to the extended services the civil war required ; and that it contemplated and provided machinery for the supply of armies for operation in the field and for the vicissitudes to be encountered there,* but that, on the other hand, the Act 1861 had no such special purpose, was not made in time of war, and did not relate specially to service in the field nor to military service; for in terms it applies to contracts in any Department of the Government, and is applicable to an emergency for stationery in the State Department, or for blanks in the Post-Office Department, or for fuel in barracks, or for any other emergency that the failure of a contractor may-make for the supply of anything needed in the ordinary routine of public business.
I adhere to these views, and hold that the decision in Speed’s Geese has not the least applicability here.
9. There is another view which, in my opinion, is fatal to the-claimants’ case.
The first section of the Act Dime 2,1862, (12 Stat. L., p. 411,) contains the following provisions:
“ That it shall be the duty of the Secretary of War, of the Secretary of the Navy, and of the Secretary of the Interior, immediately after the passage of this act, to cause and require every contract made by them severally on behalf of the Gov-' eminent, or by their officers under them appointed to make such contracts, to be reduced to writing and signed by the contracting parties with their names at the end thereof, a copy of which shall be filed, by the officer making and signing the said contract, in the ‘returns office’ of the Department of the Interior.”
This provision has several times been before this court in connection with verbal contracts entered into by Government officers, and in every case, except that of Cobb, Christy & Co., it was held that a verbal executory contract entered into by an officer of the Government after the passage of. that act, was void. In that case the verbal contract was to duplicate the supplies called for in a previous and still subsisting written contract, and it was entered into under circumstances of great and almost unparalleled emergency. This court sustained it, because it was “ the most expeditious manner ” of obtaining the supplies needed in that emergency, and therefore came within *206 the provisions of the Act July 4, 1864; and the Government paid, without appeal, the heavy judgment rendered against it in that ease.
In Henderson’s Case, previously cited, the nature and effect of that provision were fully considered, and the following points ruled: 1. That it is mandatory and imperative upon the parties to contracts with the Government, and not merely directory to the Government officers; and, 2. That it makes it as much the duty of contractors as of officers to see that its requirement is fulfilled. And this ruling has been followed in Lindsley’s' Case, (4 C. Cls. R., p. 359;) Adams’s Case, (7 ibid., p. 437;) and Lender’s Case, (ibid., p. 530.) When, therefore, the contract herein involved was entered into, the claimants’ agent, who acted in the premises for them, was bound to see and know that it conformed to the statute; as was held by the Supreme Court in Pierce v. United States, (7 Wall., p. 666,) where that court said: “Our statute-books are filled with acts authorizing the making of contracts with the Government through its various officers and Departments, but in every instance the person entering into such a contract must look to the statute under which it is made, and see for himself that his contract comes witJdn the terms of the law.”
Applying these views to' this case, I hold that the paper signed by Howland — though for convenience I have called it a contract — is no contract of the United States, because it was not “ signed by the contracting parties with their names at the end thereof,” as required by the Act June 2,1862. Let-it be observed that the statute requires the signature of “the contracting parties;’ that of the party on the one side is not sufficient; both must sign it.
If it be said that this is a matter of form merely, I point to the emphatic words of this court, holding the whole provision of that act to be “ mandatory and imperative.” We have no power, therefore, to exact fulfillment of one of its requirements, and dispense with the fulfillment of another. It is just as obligatory that the contract should be signed by both parties as that it sTiould be reduced to writing; and not having been signed by the claimants or their agent, it is, in my view, no contract at all.
Other reasons strengthén this conclusion. The paper does not, in terms, assume to bind the United States, but only the *207 signer of it. True, he “ obligates hioiself as au officer of the Government;” but those are not the terms iu which aa agent legally binds his principal.
But even if this position should be deemed untenable, there is another which, in my judgment, is sufficient, namely, that the paper imposes no obligation upon the claimants to deliver any mules at all. It is essentially unilateral — -a simple engage* ment to receive one thousand mules at certain prices, if deliv* ered on or before a certain day; an engagement wholly without consideration, because the claimants came under no contract to deliver any mules. No officer can bind the Government by such a contract, unless his authority therefor be clearly shown. The Government demands, and has a right to demand, mutuality in all its contracts; and an officer assuming to bind it is bound to see that there is a correlative obligation on the party with whom he deals; and that party is equally bound to see that he furnishes a consideration through such obligation on his part.
But there is still another test which, in my opinion, this paper cannot stand. If the claimants had failed altogether to deliver any mules on or before the 20th of April, 1865, and the market value of. mules had on that day gone up to $200 per head, could the Government have recovered from them, upon this paper, the difference between that sum and the prices therein named ? I think not. It seems to me clear that they would have two sufficient defenses: 1. That they did not engage to deliver any mules; and, 2. That they never signed the paper, as required by the statute in question, and therefore could not be charged by the Government, through an instrument which did not conform to the Government’s own requirement to give it legal validity. If these views be correct, then the conclusion is inevitable that the Government connot be charged as a party to a contract where the other party could not be.
10. There is still another and a broader view of this whole matter, which seems to me to leave no ground for this claim to rest upon.
The court finds that it does not appear that General Thomas gave any order to his chief quartermaster requiring “ the immediate procurement ” of one thousand mules for his army to meet a then present emergency. In the absence of such an *208 order it is not for tbis court, nearly nine years after tbe supposed contract was entered into, to sustain it by finding that in fact an emergency did exist, authorizing the assistant quartermaster to make the contract without advertisement for proposals.
But, even if we might do so, I propose to show that there was on the part of Assistant Quartermaster Howland an utter disregard of the law governing the case, as found in the Act July 4,1864. There was not only no emergency calling for such action as he took, but, if the existence of such an emergency should be admitted, he apparently ignored the provisions of law applicable thereto.
That act divided the office of the Quartermaster-General into nine divisions, with a distinct head anda distinct charge to each, and provided that “ the first division shall have charge of the purchase, procurement, and disposition of horses and mules for cavalry, artillery, wagon, and ambulance trains, and all other purposes for which horses or mules may be procured for the armies of the United States.”
By the second section of the act, the heads of the said nine divisions were required, under the direction of the Quartermaster-General, from time to time to advertise for proposals for the supplies necessary for the movements of the several armies, posts, detachments, garrisons, hospitals, and for other military purposes$ and, by the third section, the Quartermaster-General was required to establish depots, at places convenient to the principal armies in the field, for receiving and distributing the supplies necessary .for such armies, where the principal business connected with receiving and issuing the same should be transacted; but the Quartermaster-General, or the head of a division, might cause such supplies to be sent from the place of purchase directly to the quartermasters of the commands for whose use they were procured, in any case where it might be more economical or advantageous to do so.
The fourth section then goes on to provide u that when an emergency shall exist requiring the immediate procurement of supplies for the necessary movements and operations of an army, * * * ancl token such supplies cannot be procured from any established depot of the Quartermaster's Department, or from the head of a division charged with the duty of furnishing such supplies, within *209 the required time, then it shall be lawful for the commanding officer of snob army * *' * to order the chief quartermaster of such army to procure such supplies during the continuance of such emergency, but no longer, in the most expeditious manner, and without advertisement.
From this language it is plain that, to make such an order lawful, the following circumstances must exist: 1. The described emergency; and, 2. The inability to meet it by procuring, within the required time, the needed supplies, either from an established depot, or from the head of the division charged with procuring and issuing supplies of that description. In other words, the intention of the law was that the meeting of an emergency should no longer rest in the uncontrolled and almost irresponsible discretion of a commanding officer; but that, before resorting to the exercise of mere military will and power, he should ascertain that the supplies could not be had in time from an established depot, or from the head of the proper division. Much more was this obligatory upon subordinates.
Assistant Quartermaster Howland seems to have proceeded in this business without the least reference to the requirements of this statute, or, indeed, any other. One day he applied .for and obtained authority to pay higher prices for mules than those previously xiaid, and the next day, without authority from any quarter and -without the knowledge of his superior, he agreed to receive at those prices one thousand mules any time within the next forty-two days, and that without at the time requiring the party to whom he gave his written engagement to deliver a single one. If such a transaction as this can be sustained, so as to impose a liability upon the Government for heavy damages, it must be without my assent.
In my judgment the claimants’ petition ought to be dismissed.
Loeing, J., did not sit at the hearing of this case, and took, no part in its decision.