## MERCHANTS AND FARMERS COTTON OIL COMPANY v. LUFKIN NATIONAL BANK.

### Decided February 18, 1904.

**1.—Principal and Agent.**

The principal is bound by the act of his agent only where the agent performing the act assumes to act for his principal.

**2.—Same.**

The treasurer of an oil company, having authority to execute promissory notes for it, attached to a note of the company to a banking firm of which he was a member the stenciled signature of the company, forging thereto the name of the company manager as the agent by whom it was executed, and had it attested by the secretary of the company with its seal and discounted by an innocent purchaser, appropriating the proceeds without giving the company credit. Held, that the oil company was not bound on the note by his act in affixing with his own hand the signature of such company by reason of the fact that he had authority to issue negotiable paper for it, since he assumed to act in the matter for the bank and not for such oil company.

**3.—Forged Note—Ratification—Power to Offset.**

A corporation could not be held liable to an innocent purchaser of its note payable to a banking firm, a member of which had forged and discounted the note without giving it credit, by reason of the fact that it was still in its power to ratify the note and protect itself by claiming credit for the proceeds on the overdraft due by it to the bank.

**4.—Same.**

The fact that the payor of the forged note was indebted to the bank to which it was made payable, for a large overdraft, was no ground for requiring it to ratify the note and claim credit with the bank on such overdraft, for the protection of the innocent holder of such forged notes, when many similar forgeries might be in circulation and exceed the amount of its overdraft.

**5.—Principal and Agent.**

Where the principal has clothed his agent with power to do an act upon the existence of some extrinsic fact peculiarly within the knowledge of the agent and of the existence of which the execution of the power is in itself a representation, a third person dealing with such agent in entire good faith, pursuant to such apparent power, may rely upon the representation and the principal is estopped to deny its truth to his prejudice.

**6.—Corporation—Forged Note—Attestation by Secretary and Seal—Innocent Purchaser.**

The act of the secretary of an industrial corporation in attesting with his signature and the corporate seal the promissory note of a corporation, was a guaranty of its genuineness making it good in the hands of an innocent purchaser, though the signature of the agent purporting to execute it was a forgery and the company had never received the benefit of the proceeds.

**7.—Negotiable Instrument.**

A promissory note payable to the order of W. & Son was a negotiable instrument.

Appeal from the District Court of Nacogdoches. Tried below before Hon. Tom C. Davis.

*Blount & Garrison*, for appellant.

*E. J. Mantooth, W. H. Arnold*, and *M. M. Feagin*, for appellee.

GILL, ASSOCIATE JUSTICE.—This suit was brought by the Lufkin National Bank to recover of the Merchants and Farmers Cotton Oil

Company, a corporation, an indebtedness of $5000 alleged to have been evidenced by a promissory note for that amount which was made the basis of the suit and which purported to have been executed for the corporation by its general manager and attested by its secretary with the seal of the corporation affixed.

The defendant oil company answered by plea of non est factum. That the general manager, Pearson, whose name was signed to the note had no authority to execute notes for the company, and further that his signature was a forgery. There was no answer for the defendant Wettermark.

The bank by supplemental petition pleaded in substance that it purchased the note in due course of trade from the Wettermark Bank, paying a valuable consideration therefor and without notice of any vice therein. That the oil company had held out its general manager as having authority to issue negotiable paper in the corporate name and was estopped now to deny such authority. That if Pearson's name was in fact signed to the note without his authority it was nevertheless attested by Allan Seale, the secretary of the oil company, as the genuine signature of Pearson and the note as the act of the company, and the company was bound by the representation of its secretary, the plaintiff having no notice of the fraud.

Further, that whether or not Pearson had authority to issue notes for the company and whether or not Pearson's signature was affixed to the note without his authority, the act was nevertheless done by B. S. Wettermark, the oil company's treasurer, clothed with full authority to issue such paper and done in behalf of the company, wherefore it became immaterial that Pearson's name was signed instead of Wettermark's.

Further, that the bank of Wettermark & Son is bankrupt. That the oil company is indebted to said bank in the sum of $20,000 carried by said bank as an overdraft, and that for this reason the oil company has the right to offset the note in question against the indebtedness to the bank, wherefore it ought to be held bound in any event.

Then follow allegations with reference to the course of dealing between the oil company and the Wettermark Bank and between it and B. S. Wettermark, its treasurer, and with reference to the negligence of the oil company in failing to supervise its officers, which need not be set out in this connection. A trial before the court without a jury resulted in a judgment for the plaintiff from which the oil company has appealed and by appropriate assignments of error presents the questions hereinafter discussed.

The note sued on was for the sum of $5000 with interest and the usual collection stipulation. It was dated Nacogdoches, Texas, November 6, 1902, and was payable to the order of A. Wettermark & Son ninety days after date. It purported to be signed by the Merchants and Farmers Cotton Oil Company by W. B. Pearson, its general manager. B. S. Wettermark for the firm of A. Wettermark & Son, bankers at

Nacogdoches, Texas, sold the note to the appellee bank for value and indorsed it to them before maturity, they having no notice of any fact that would render it invalid. Before its due date the Wettermarks became insolvent and B. S. Wettermark left the country. The note was presented to the oil company at maturity for payment, but payment was refused on the ground that the note was a forgery as to Pearson's name and that it was in no respect the act of the company.

The facts leading up to and attending the execution of the note are as follows:

The oil company had been organized as a trading corporation in 18—, and was engaged in the manufacture and sale of cotton seed oil and other cotton seed products. Its domicile was Nacogdoches, Texas, and all its directors and officials lived in that town. It did about $40,000 worth of business each milling season, but kept no record of its transactions except the entries on the check stubs, and invoices and bills of lading. At the end of the season this data would be checked up and compared with their bank statement and thus would the result of a season's business be disclosed. Notwithstanding these loose methods a 20 per cent dividend was declared in 1900, 10 per cent in 1901 and 20 per cent in 1902.

E. A. Blount was its president, Allan Seale its secretary, B. S. Wettermark the treasurer, and W. B. Pearson its general manager. As it was necessary for the concern to borrow large sums of money during the busy season its directory arranged that Wettermark should finance the concern through his bank and otherwise. For this purpose he was authorized by the board of directors by a by-law to issue negotiable paper in the name of the company, signing his name as treasurer, attested and sealed by the secretary. This he did from a time prior to the appointment of Pearson as manager until the failure of his bank. At the date of the issuance of the note in question and at the date of his failure the oil company owed his bank in the form of an overdraft the sum of $20,000, and at times during the season as much as $30,000.

It had been his custom, with the knowledge of the company, to procure the issuance of company notes payable to his bank or to others and discount same at other banks whenever the company's overdraft became too heavy for his bank to carry, and this he had done several times during the season in question.

At a prior meeting of the board of directors it had been determined orally that as B. S. Wettermark was a heavy stockholder in the company, and was expected to finance the concern, the promissory notes necessary to be issued to that end, when payable to his bank, should be signed by Pearson, their general manager, who under his general powers as such issued all checks upon company funds.

During the season in question and prior to the issuance of the note in question Pearson had signed several notes for the company which were taken to the secretary by Wettermark, duly attested and sealed, thereafter negotiated to others by Wettermark and duly paid when presented.

Seale, the secretary, testified that since Pearson became manager nearly all of the notes he had attested as secretary had been signed by Pearson, the note in question being the first unauthorized use of his name.

The plaintiff bank had during the season in question handled four or five notes of the company signed by Pearson and attested by Seale and they had all been duly paid at maturity except the one in question. All having been negotiated through B. S. Wettermark.

The transactions of a similar nature with other banks need not be stated, as they are not shown to have been known by or to have influenced the plaintiff bank in the purchase of this note.

B. S. Wettermark drew the note in question, signed the oil company's name by a stencil usually used for that purpose, "per Pearson, General Manager," signing the name of Pearson thus without his knowledge or authority. He, Wettermark, then took the note to Allan Seale, the oil company's secretary, and had him attest and seal it as secretary of the company. Seale did not know that Pearson's signature was not genuine. The money procured by Wettermark on this note does not appear to have been placed on his bank books to the credit of the oil company, but the company through its general manager continued thereafter to draw upon the Wettermark Bank, the amount of the overdraft varying but never falling under $20,000. It is not made to appear that in any way was the oil company given credit for this note or its proceeds.

The trial court filed no conclusions of fact and law, so we are unable to determine upon what ground he rested his judgment.

It is contended by appellant that upon none of the grounds urged by appellee can the judgment be upheld. This broad contention involves the question of the sufficiency of the evidence to support the conclusion that the oil company either by direct authority or by a course of dealing had authorized its general manager, Pearson, to execute negotiable paper for it. Without entering into detailed discussion of the evidence we hold that the proof was ample upon the point.

This leaves for our determination the following questions of law:

First. Was the company bound by reason of the fact that Wettermark, who had authority to issue negotiable paper in its behalf, did in fact issue the note in question, affixing with his own hand the signature of the company?

Second. Does the fact that the oil company is largely indebted to the Wettermark Bank, and for that reason may offset this note against such indebtedness, authorize a judgment against it?

Third. Did the genuine attestation of the secretary relieve the purchaser of the note from the necessity of further inquiry as to the authenticity of the paper?

The first question must be answered in the negative for the obvious reason that the principal is bound by the act of his agent only where the agent in performing the act in question assumes to act for his principal.

Here the transaction purported to be one between the Wettermark Bank and the oil company, and Wettermark assuming to act for his bank in the matter made the company purport to act through its general manager. The purchaser dealt with Wettermark as a private individual and was not influenced and could not have been properly influenced by the belief that the paper was the act of Wettermark in behalf of the company.

The second question must receive a like answer for reasons equally obvious. While it is true that the oil company, had it received the benefits of the proceeds of the note, would have been bound to restore it with interest, however irregular or unauthorized the act by which it was procured, yet in this case it is not shown to have enjoyed the proceeds. It will not do to say that by confessing judgment in this case or ratifying at this late day the unlawful act of Wettermark the oil company may offset the debt against the claim of the Wettermarks, thereby at once protecting itself and saving the appellee from the consequences of an improvident transaction.

It is safe to assume that the court in which the Wettermark bankruptcy proceeding is pending will inquire whether the oil company was bound by the note in question, and in the interest of other creditors will render its judgment accordingly.

Another answer equally effective is the fact that if the note in question is a forgery not binding upon the company, there may be many more outstanding, so that if such a course were adopted the overdraft might be offset in full without satisfying all the outstanding fraudulent paper. No reason is shown why the bank in this case should be chosen for protection instead of some other innocent holder of like paper, even if it should be held in any event that the oil company was bound to protect the holder of paper by which it was in no sense bound.

The third question is one of greater difficulty. To answer it in the affirmative involves a holding that a private trading corporation may not bind the public by regulations, established as a check against fraud or malfeasance on the part of their officials, in cases where the final official act by which the paper is declared to be the act of the company is genuine, the paper fair upon its face, within the scope of the official power of the official and the corporate power of the corporation.

We are of opinion that the question resolves itself into one of agency pure and simple, and that its solution lies in the application of the most general and well established rules governing that relation.

It is well settled that "where the principal has clothed his agent with power to do an act upon the existence of some extrinsic fact peculiarly within the knowledge of the agent and of the existence of which the execution of the power is in itself a representation, a third person dealing with such agent in entire good faith pursuant to such apparent power, may rely upon the representation and the principal is estopped to deny its truth to his prejudice." Tome v. Parkersburg Ry. Co., 17 Am. Rep.,

554; New York & N. H. Ry. Co. v. Schuyler, 34 N. Y., 30; Mora. on Corp., sec. 588.

In the case first cited the railway company had by appropriate by-laws provided for the issuance of its stock and prescribed the method of its issuance. The signature of the president was necessary to its validity, its treasurer being required also to sign the certificates and affix the corporate seal. The treasurer for his own purposes issued a lot of fraudulent stock to which he forged the signature of the president, his own signature and the seal being genuine. The certificates fair upon their face fell into the hands of an innocent holder for value.

In a suit by the holder against the company for the value of the shares a recovery was permitted, it being held that the act of the treasurer was within the apparent scope of his powers. That his signature and the seal of the company constituted a representation that the certificate was the act of the company and the signature of the president genuine.

To the same effect is Fifth Avenue Bank of New York v. Street Ry. Co., 19 Law. Rep. Ann., 331.

The books abound in cases holding that where the agent of a private corporation, acting within the general or apparent scope of his power, does an act in fraud of his principal the latter is nevertheless responsible to the innocent holder, the courts choosing without hesitation between the alternatives of imposing the loss upon the one innocently dealing with the agent and upon the corporation which by creating the agency and reposing the trust rendered the injury possible.

Thus in Railway Co. v. Schuyler, supra, the treasurer was held to have bound his principal by the fraudulent issue of stock. In that case the name of no official of the company was forged. The opinion in that case is one of unusual ability and is recognized by other authorities as being a compendium of the law on the subject.

Of a like nature is the case of Allen v. Railway Co., 5 Law. Rep. Ann., 716. In that case and in Railway Co. v. Citizens Nat. Bank, 43 Law Rep. Ann., 777, the stock fraudulently issued by the secretary had been signed in blank by the president and fraudulently filled in by the secretary, and in the latter case it was said in effect that the genuine signature and seal of the secretary was an assurance by the company to the world that the paper was genuine.

The same principle is recognized in Baker v. Wasson, 59 Texas, 140. It was but a logical step from the doctrine announced in Schuyler's case, supra, and like cases to that in Tome v. Parkersburg Ry. Co., supra, and Fifth Avenue Nat. Bank v. Railway, 19 Law. Rep. Ann., 331, in which the secretary had forged the name of the president, whose signature was also necessary to the validity of the paper.

We are of opinion that to apply a like rule to the issuance of a promissory note in the name of the corporation, the corporate power to issue such paper being unquestioned, does not amount to an extension of the doctrine. The case at bar is necessarily included within the principle. Thomp. on Corp., sec. 6070. If to knowingly certify and append the

seal of the company to forged and fraudulent stock certificates, which are only quasi negotiable, is a binding representation by the secretary that the stock is genuine, for a much stronger reason is the company bound when the secretary, negligently ignorant of the facts, certifies and seals a forged note negotiable in form as the genuine act of the company. To so certify and seal genuine notes was within the secretary's express powers. How otherwise except through its secretary and by its seal could the representation be made? If his attest and seal does not amount to such representation it is a meaningless and empty form. At this point the company which can act only through agents of its own selection comes in touch with the business public. Had any question been made as to the validity of the paper it was to the secretary that inquiries would have naturally been addressed. Had the inquiry been made in this case the secretary, who remained ignorant of the facts until the final dishonor of the note, would have continued to assert its genuineness. What force would a subsequent assertion by him of its genuineness have added to his original solemn and formal attestation of the fact.

We are aware that a few cases have announced the opposite rule to that laid down in Schuyler's case, supra, but so far as we are able to ascertain they have been discredited. The decided weight of authority supports the rule as we have stated it. Thomp. on Corp., secs. 1493, 1494, 1500, 1501, 2596, 488, 489; Mora. on Corp., sec. 605.

For reasons of public policy a different rule applies to the acts of agents of municipal corporations and governments. Hence such authorities as the Floyd acceptance cases, 7 Wall., 666, have no application here. The principle that "the protection which commercial usage throws around negotiable paper can not be used to establish the authority by which it was originally issued" (Floyd acceptance cases, supra) is recognized as obviously sound, nor have we been influenced by the nature of the paper except in so far as it served to render its holders innocent. We do not hold that if the paper were an ordinary forgery any presumption would be indulged in its favor. We hold rather that the innocent holder for value is in the same position as one who unknowingly purchases a forged note, certified by the purported maker to be genuine. Or of one who being about to purchase a negotiable instrument asks the purported maker if his signature is genuine and is assured that it is.

We have treated as without merit the contention of appellant that the note in question was nonnegotiable because payable to the order of the payees, and are confident the point is untenable.

We are of opinion the judgment should be affirmed and it is so ordered.

*Affirmed.*

## ON MOTION TO FILE ADDITIONAL CONCLUSIONS OF FACT.

GILL, Associate Justice.—In response to a motion by appellant to find additional conclusions of fact, we find as follows:

The written by-law by which the president and treasurer were au-. thorized to incur indebtedness and issue notes for the company is as follows:

"To incur indebtedness within the limits fixed by the corporate laws of the State granting the charter for the corporation, the terms and amount of such indebtedness shall be entered in the minutes of the meeting of the board of directors, and any note or obligation given for such indebtedness when signed officially by the president or treasurer of such corporation and such signature duly attested by the secretary shall be binding on the corporation."

We deem it proper to add in this connection that the provision regarding the entry of the indebtedness in the minutes was never regarded and no record appears to have been kept of notes issued. The record shows that complete minutes of the proceedings of the directory were not preserved, and the proof is undisputed that B. S. Wettermark not only had but exercised the fullest authority in financing the concern.

It is not made to appear by any written by-law that the secretary was empowered to attest the signature of Pearson to notes, but we think the determination that Pearson should sign certain notes instead of Wettermark placed his signature in the same category as if included in the by-law above quoted, especially since it is fairly inferable from that law that it was the secretary's duty to attest all such evidences of indebtedness.

We were in error in stating in the main opinion that in signing the note in question or other notes the secretary affixed the seal of the corporation. The record shows that he simply attested it officially as the by-law required. The error, however, is immaterial.

The directors testified that they did not know Pearson was signing any notes of the company, but E. A. Blount paid off one signed by him, and Dotson and Perkins, two of the directors, stated they did not know that anyone was authorized to issue notes for the company, or that anyone was doing so. This is a further illustration of the loose methods of the company. Neither the president nor any of the directors showed any familiarity with the dealings of the concern, and but a dim and uncertain recollection of the doings of the directory. We therefore feel justified in our first conclusion that Seale's testimony is true that at a meeting of the directors or stockholders, the minutes of which were not preserved, it was ordered that when Wettermark found it necessary to issue a note of the company to his own bank it should be signed by Pearson instead of himself. We are strengthened in this conclusion by the undisputed fact that frequently during the time Pearson was manager this course was pursued.

All the notes signed or purporting to be signed by Pearson except the note in question had embodied in them the words, "by authority of the board of directors." The notes discounted by the appellee bank were all for the individual credit of the Wettermarks, but with the exception

of the note sued on all the proceeds were credited by Wettermark to the oil company.

We did not base our conclusion on the assumption that Pearson's general authority as manager included the right to sign notes, but upon the proof that under certain circumstances as indicated in the main opinion he should sign in Wettermark's stead and that such a course had been pursued.

To the extent above indicated the motion is allowed.

Writ of error refused.