**Richard NEUSER, Plaintiff,**

v.

**Nancy HOCKER, Hocker–Frick Agency, Inc., and Auto Owners Insurance Co., Defendants**

and

**Nancy Hocker and Hocker–Frick Agency, Inc., Third Party Plaintiffs**

v.

**Auto Owners Insurance Co., Third Party Defendant.**

No. 4:98–CV–104 M/B.

United States District Court, W.D. Michigan, Southern Division.

July 22, 1999.

788

John E. Dewane, Butzbaugh & Dewane, St. Jospeh, MI, for plaintiff.

David S. York & Michael J. Miller, York & Tiderington, PC, Kalamazoo, MI, for Defendants Hocker and Hocker–Fritz.

Arthur W. Brill, James, Dark & Brill, Kalamazoo, MI, for Third–Party Defendant Auto Owners.

## OPINION

BRENNEMAN, United States Magistrate Judge.

This matter is before the court on the motions of Auto Owners Insurance Company (herein "the Company") for summary judgment on plaintiff's claims (docket no. 31) and for summary judgment on the third-party claims of Nancy Hocker and the Hocker–Frick Agency, Inc. (herein collectively "the Agency") (docket no. 32), and the motion of the Agency for summary judgment on plaintiff's claims (docket no. 37).

### Background

Plaintiff's house fell into Lake Michigan. He sought coverage for his losses from the Company based on flood insurance he had purchased through the Agency. The Company denied coverage. Plaintiff contends the Agency and the Company are liable to him for his losses because of their tortious conduct in the nature of fraudulent misrepresentations (or omissions) and negligence. The Agency, in turn, contends that there is indeed coverage for plaintiff's loss and that the Company wrongfully denied coverage or, alternatively, if there is not coverage, the Company is liable for plaintiff's losses under tort theories similar to those raised by plaintiff.

Plaintiff filed this action in Berrien County Circuit Court against only the Agency. The Agency then filed a third party claim against the Company which, in part, sought coverage under the flood insurance policy. The Company then removed the case to this court in that such claims are subject exclusively to federal jurisdiction. Once the parties were before this court, plaintiff sought and was granted leave to amend to add his claim against the Company. All of the claims between the parties were before the court in connection with the pending summary judgment motions. Since the summary judgment motion was argued, however, all claims between plaintiff and the Agency have been resolved. Accordingly, the Agency's motion for summary judgment on plaintiff's claims against it is DENIED as moot.

### Standard

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir.1995), the Sixth Circuit described the standard for deciding a Rule 56 motion as follows:

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir.1993). The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 2552–53, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *LaPointe*, 8 F.3d at 378. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on

which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

*Id.* at 478–79.

### Statement of Facts

Many of the facts relevant to this action are not in dispute. There appears to be no dispute that plaintiff purchased the home at 2761 Lake Bluff Terrace, St. Joseph, Michigan, during August of 1989. The home was situated on a bluff overlooking Lake Michigan. According to plaintiff, at the time he purchased the home, the bluff was sixty to seventy-five feet from the home; however, he was aware at that time that there was a danger the bluff would erode causing the house to collapse into the lake. Plaintiff acknowledged that he obtained the home at a discount probably because of that danger.

In connection with the purchase of the home, plaintiff purchased homeowners insurance through the Agency. A couple of months after he bought the home he also purchased flood insurance. Plaintiff acknowledges that he received a copy of the Upton–Jones Amendment relating to his flood insurance coverage.

Initially, plaintiff was not sure whether he would resell the home or maintain it as his residence. Accordingly, at first, plaintiff purchased only a one-year flood insurance policy. Plaintiff put the house on the market for a period of time; however, he eventually became sufficiently comfortable with the insurance coverage and the home that he decided to stay there. At that time, during 1991, he purchased a three year flood insurance renewal policy through the Agency from the Company. In plaintiff's words he wanted to make sure he was "covered for the day it finally went." Transcript of plaintiff's deposition, September 11, 1998, p. 25 (herein "Transcript", Exhibit A to docket no. 31). He "was going to ride it over." Transcript, p. 28.

As time passed, the bluff eroded. By 1993, the bluff's edge was within three feet of the northern corner of the home. Although the erosion caused structural changes in the home, such as twisting and cracking, and prompted plaintiff's friends and family to encourage him to abandon the home, plaintiff stayed. He kept the Agency informed as to the progress of the erosion, but when they pressed him about making a claim, he informed them he intended to wait until the last possible minute before filing.

The Company sent plaintiff a renewal notice for the flood insurance policy during the fall of 1994 which indicated that his insurance would expire on October 17, 1994, if he did not renew it. Plaintiff paid the three year renewal premium by check dated September 15, 1994. There is no dispute that plaintiff had coverage in place at all times relevant to this action.

Shortly after plaintiff renewed his policy in 1994, Congress changed the coverage available to plaintiff by repealing the Upton–Jones Amendment. As will be discussed in more detail below, the Upton–Jones Amendment to the National Flood Insurance Act permitted recovery under the policy prior to the presence of actual damage to the insured building. Under the Amendment, if a state or local agency certified that a building was subject to imminent collapse or subsidence because of erosion or undermining caused by waves or currents exceeding anticipated cyclical levels, the insurance contract would permit payment for demolition or relocation of the structure. 42 U.S.C. § 4013. Plaintiff acknowledges that his home could not have been moved and that he wanted to stay in it as long as he could.

The repeal, enacted September 23, 1994, permitted payment of claims for a period of one year following enactment. Thus, to

be eligible for Upton–Jones benefits, plaintiff would have had to submit a claim before September 23, 1995. He did not. Instead, he continued his position of waiting until the last possible minute, enjoying the house as long as he could before cashing in on his insurance policy.

At some time during 1996, a representative of the Agency attended a seminar where he learned that Upton–Jones coverage had been repealed. He informed plaintiff of this fact. Plaintiff then turned the matter over to counsel.

In March of 1997, plaintiff's house began to fall into Lake Michigan. Plaintiff eventually submitted a claim to the Company during October of 1997; however, he did not tell the Company when the home began to fall into the lake. The Company informed plaintiff that the Federal Emergency Management Agency would pay claims if the lake levels during 1997 exceeded those during 1973 and, because that did not occur during 1997, there could be no coverage. The stated reason for denying coverage (comparing lake levels from 1973 to levels when the loss accrued) was expressly rejected by the Sixth Circuit in *Berger v. Pierce,* No. 91–3892, 1992 WL 393595 (6th Cir. December 22, 1992) (herein *Berger II* ). Nonetheless, the Company has since offered additional reasons in support of the denial of coverage including plaintiff's failure to timely submit a proof of loss within sixty days of the loss.

### Discussion
### The National Flood Insurance Program

The National Flood Insurance Program (the "NFIP") was established in 1968 by the National Flood Insurance Act (the "Act"), 42 U.S.C. §§ 4001 et seq. Con-gress established the NFIP "because private insurance companies were unable to write flood insurance policies on an economically feasible basis and something had to be done to alleviate some of the extreme hardships suffered by flood victims." *Quesada v. Director, Federal Emergency Management Agency,* 753 F.2d 1011, 1014 (11th Cir.1985). Congress determined that a reasonable method of sharing the risk of flood losses would "complement and encourage preventative and protective measures . . . ." 42 U.S.C. § 4001(a).

The Act's purpose is accomplished in part through offering a Standard Flood Insurance Policy [1] to persons who are at risk of suffering flood losses to buildings. The SFIP is a single risk insurance policy. It provides coverage only for "direct physical loss by or from flood." Initially the Act employed a limited definition of flood: "[flood shall have] 'such meaning as may be prescribed in regulations of the Director, and may include inundation from rising waters or from overflow of streams, rivers, or other bodies of water, or from tidal surges, abnormally high tidal water, tidal waves, tsunamis, hurricanes or other severe storms or deluge[.]' " *Berger v. Pierce,* 933 F.2d 393, 395 (6th Cir.1991) (herein *Berger I* ).

Conspicuously absent from the initial list of "flood" events is the cause of the loss in this case: erosion. Thus, at the inception of the NFIP, if flood waters damaged the home of an insured, coverage would be provided; however, if flood waters eroded the land beneath the home of an insured, causing its collapse, there would be no coverage.

In 1973, in response to "wide-spread demand," *Berger I,* 933 F.2d at 395, Con-

---

**1.** The Standard Flood Insurance Policy is set forth at 44 C.F.R. Pt. 61, App. A(1) and shall be referenced herein as the SFIP. The SFIP is amended periodically and, because plaintiff's SFIP coverage spanned an eight year period, several versions of the SFIP may be relevant to this analysis. During the period at issue, there have been no significant substantive changes to the SFIP which bear on the matters at issue here.

gress enacted the Flood Disaster Protection Act which expanded the definition of "flood" to include "the collapse or subsidence of land along the shore of a lake or other body of water as a result of erosion or undermining caused by waves or currents of water exceeding anticipated cyclical levels . . . ." 42 U.S.C. § 4121(c). In light of this expansion, the SFIP, at least as it related to plaintiff's property[2], covered direct physical loss by or from the collapse or subsidence of land as a result of erosion or undermining caused by waves or currents of water exceeding anticipated cyclical levels.

### The Upton–Jones Amendment

Although the SFIP provided coverage for those instances where high lake levels caused erosion which actually damaged houses, it did not substantially assist those who could anticipate the imminence of such damage and wished to avoid it. This problem was noted by U.S. Congressman Fred Upton, representative for the Michigan's 6th district which includes the property at issue in this dispute. Representative Upton described the problem as follows:

> In the fall of 1986 terribly high water levels occurred and hundreds of homeowners around the Great Lakes with flood insurance policies faced a very difficult situation. Should they preserve their homes and relocate? Should we save the expense? Should we file flood insurance claims? No one really knew what to do, but they decided in oft many cases they actually had to wait to see their house fall into the Great Lakes. What financial incentive did these homeowners have to save their homes to prevent serious environmental problems that occurred when their homes, including the sewage systems, the septic

tanks, the garage doors, the aluminum siding, their roofs, washed and tumbled into the Great Lakes? The answer was: None.

135 Cong. Rec. H5729–5730 (September 19, 1989).

To address this problem, Congress enacted what the parties refer to as the Upton–Jones Amendment (herein the "Amendment"). Pursuant to the Amendment, codified at 42 U.S.C. § 4013(c) and since repealed, homeowners were no longer required to wait for their homes to slide into the lake. Instead, the Director was authorized to pay amounts for demolition of the home or its relocation if the home were (1) covered by flood insurance, (2) located on land along the shore of a lake or other body of water, (3) certified by an appropriate State or local and use authority to be subject to imminent collapse or subsidence as a result of erosion or undermining caused by waves or currents of water exceeding anticipated cyclical levels.

The only difference between the erosion coverage already provided and that provided by the Amendment appears to be the timing and, therefore, possibly the amount of the payment. Under the existing SFIP coverage, payment would only follow actual damage to the structure or contents. Under the Amendment, payment could occur before actual damage to prevent such damage (by relocation) or to minimize its scope (by timely demolition). Such an interpretation is certainly consistent with Representative Upton's description of the Amendment:

> To address the problem, a number of us offered financial incentives to the Flood Insurance Program for homeowners to move or demolish their homes before creating environmental disaster, to draw a large payout from the National Flood Insurance Fund. . . . Since the enact-

---

**2.** The likelihood that a "flood" in the traditional sense would cause damage to plaintiff's home sitting on a bluff above Lake Michigan is certainly not significant.

ment of this proposal, the Jones–Upton amendments, the environmental and financially expensive practices of letting homes fall into lake waters have been replaced by a much better procedure. We saved taxpayers money by relocating structures when we can for a fraction of the cost instead of paying a full claim on the structure. We save money through alternatives of relocation or demolition . . . .

135 Cong. Rec. H5730 (September 19, 1989).

The House Conference Report likewise supports the interpretation that the Amendment affected only the timing and, therefore, the amount of coverage:

> This provision is not intended to expand the scope of coverage under the NFIP. The provisions will be triggered only when the Director determines that a structure is subject to imminent collapse. Therefore, these provisions will apply to those structures which, with a high degree of certainty, are likely to collapse within the near future. . . . Through advance identification of imminently threatened structures, structural collapse and total loss claims under the NFIP can be avoided. Thus, the conferees do not expect this provision will result in a net increase of claims under the NFIP, nor in significantly increased costs to the taxpayer. To the contrary, this process of advance identification is expected to reduce the value and number of NFIP claims over the long-term. In addition, the value of claims can be significantly reduced by encouraging relocation of threatened structures. Moreover, the total number of claims should decline as highly exposed structures are relocated beyond the erosion setbacks required under paragraph (5), thereby mitigating the potential for future repetitive claims.

H.R. Conf. Rep. 100–426 (1987) reprinted in 1987 U.S.C.C.A.N. 3317, 3535.[3]

Although Congress anticipated the Amendment would result in savings for the NFIP, it also considered the possibility that the Amendment might prove more costly. Accordingly, the Committee directed the Federal Insurance Administrator to make semi-annual reports regarding the costs associated with the Amendment, H.R. 100–122 (1987), and the Amendment included a sunset date of September 30, 1989. Under the terms of the Amendment, no Upton–Jones payments could be made unless a commitment was made prior to the sunset date.[4] This sunset was extended twice, first to September 30, 1991, Miscellaneous Reauthorizations, Pub.L. 101–137, November 3, 1989, and then to September 30, 1995, Omnibus Budget Reconciliation Act of 1990, Pub.L. 101–508, November 5, 1990. Before the sun set on the Amendment, however, it was repealed.[5]

3. During the hearing, the Company argued that the same words used in the Upton–Jones amendment ("collapse or subsidence of land along the shore of a lake or other body of water as a result of erosion or undermining caused by waves or currents of water exceeding anticipated cyclical levels") had a different meaning when they were used to define "flood." Although it is true the legislative history of the expanded definition of flood suggests a "sudden" event, see S.Rep. No. 583, 93d Cong., 1st Sess. 14 (1973), reprinted in 1973 U.S.C.C.A.N. 3217, 3229, to the extent the legislative history of the Upton–Jones amendment does not include the same type of limitation, this court will not impute different meanings to the exact same words in a statute just because they were enacted at different times with different legislative histories.

4. As used in the Amendment, the regulations interpreted "commitment" to mean condemnation, certification, or receipt of the notice of claim. 44 C.F.R. § 63.11.

5. Because of the sunset provision, the repeal of Upton–Jones had a minimal effect. Congress could have simply taken no action and

Congress repealed the Amendment as part of the Riegle Community Development and Regulatory Improvement Act of 1994, Pub.L. 103–325 September 23, 1994. The Act provided that the Director could pay for relocations and demolitions under the Amendment for one year after the date of enactment and compelled him to take any action necessary to make payments under the Amendment pursuant to any commitments made before September 23, 1995.[6] The reason for the repeal was simple, the Amendment did not save money. *See* 139 Cong. Rec. S10841–02, S10859 ("[T]his program has not functioned as intended by Congress, and has contributed to the current deficit in the flood insurance fund by providing excessive payment that are not actuarially based."); H.R. Rep. 103–414 ("[T]he Upton–Jones amendment created a significant loophole for property owners, allowing the homeowner to collect for flood damages to the property, even repeatedly, and then at a later date, collect for relocation or demolition expenses.").

At the heart of plaintiff's claims against the Agency and the Company lies his allegation that these defendants should have told him that the Upton–Jones Amendment coverage was being repealed. According to plaintiff, had he known that fact, he would have timely filed a claim for Upton–Jones benefits.

It is apparent from plaintiff's conduct during the relevant time period and his pleadings that he equates the Upton Jones–Amendment with erosion coverage. In plaintiff's mind, when the Upton–Jones Amendment was repealed, he lost erosion coverage. That is simply not the case.

As explained above, since 1973, the SFIP has provided coverage for losses from "the collapse or subsidence of land along the shore of a lake or other body of water as a result of erosion or undermining caused by waves or currents of water exceeding anticipated cyclical levels . . . ." 42 U.S.C. § 4121(c). Using the same language, the Amendment simply extended coverage to circumstances where such collapse or subsidence was certified to be imminent. A common-sense reading of the law indicates that the only thing plaintiff lost when the Amendment was repealed was the right to seek benefits before he actually suffered damage to his home.

## Administration of the NFIA

As noted by the Sixth Circuit in *Berger I:*

The operational methods of the NFIP have changed over time. When the Act was drafted, Congress set up two different methods for operating the program: Plan A, for private-industry involvement, and Plan B, for administrative supervision of the program. From 1968 to 1977, NFIP operated under the statutory Plan A, which permitted the private insurance industry to implement and operate the flood insurance program with limited federal involvement. At the end of that time the Secretary of HUD discontinued Plan A and implemented statutory Plan B. Plan B placed primary responsibility for operating the flood insurance program with the federal government. Under Plan B, the Federal Emergency Management Administration (FEMA) has managerial responsibility for the operation of the NFIP, among

---

the payment of Upton–Jones benefits would have ceased anyway, a mere seven days later than it did following repeal.

**6.** The term "commitment" was not defined in the repealing act; however, presumably, the

term would have the same meaning in the repealing act as it had in the sunset provision: condemnation, certification, or receipt of the notice of claim. 44 C.F.R. § 63.11.

other federal programs, and complete control of the payment or disallowance of all flood insurance claims. FEMA has promulgated a standard flood insurance policy, the primary policy that is involved in this case. 44 C.F.R. S 61, App.A. The FIA is a component organization of FEMA charged with administering the NFIP. The FIA is headed by the Federal Insurance Administrator.

*Berger I,* 933 F.2d at 395. FEMA does not act alone in marketing and adjusting claims under NFIP policies:

In 1983, pursuant to regulatory authority granted by Congress in 42 U.S.C. S 4081(a), FEMA created the "Write Your Own" ("WYO") program. *See* 44 C.F.R. §§ 62.23–.24. Under this program, private insurance companies ... write their own insurance policies. 44 C.F.R. § 62.23. The WYO companies must then remit the insurance premiums to the Flood Insurance Administration ("FIA"); however, the companies may keep funds required to meet current expenditures, which are limited to five thousand dollars. *See* 44 C.F.R. Pt. 62, App. A., Art. VII(B). When WYO companies deplete their net premium income, a phenomenon that occurs regularly because the companies must forfeit a significant portion of the proceeds from premiums, they draw money from FEMA through letters of credit to disburse claims. *See* 44 C.F.R. Pt. 62, App. A, Art. IV(A). Thus, regardless whether FEMA or a WYO company issues a flood insurance policy, the United States treasury funds pay off the insureds' claims. *See Gowland v. Aetna,* 143 F.3d 951, 955 (5th Cir.1998); *Spence,* 996 F.2d at 795 n. 12; *In re Estate of Lee,* 812 F.2d at 256.

Although WYO companies have the responsibility of defending against claims, FEMA reimburses the WYO companies for their defense costs. 44 C.F.R. § 62.23(i)(6). WYO companies are fiscal agents of the United States. 42 U.S.C. § 4071(a)(1) (authorizing FEMA director to utilize insurance companies as "fiscal agents of the United States"); *see also Gowland,* 143 F.3d at 953. However, WYO companies are not general agents of the federal government. *See* 44 C.F.R. § 62.63(g). FEMA fixes the terms and conditions of the flood insurance policies, which, barring the express written consent of the Federal Insurance Administrator, must be issued without alteration as a Standard Flood Insurance Policy ("SFIP"). 44 C.F.R. §§ 61.4(b), 61.13(d), 62.23(c), 62.23(d); *see also Gowland,* 143 F.3d at 953.

*Van Holt v. Liberty Mut. Fire Ins. Co.,* 163 F.3d 161, 165–166 (3rd Cir.1998). The Company issued plaintiff's policies under the WYO program.

### The applicable law

█ In making his claim against the Company, plaintiff asks the court to rely upon state common law with regard to insurance practices. The Company, on the other hand, contends that the unique nature of the NFIP compels the application of federal common law. Actually, both parties are correct to a certain extent. As noted in *Leland v. Federal Insurance Administrator,* 934 F.2d 524 (4th Cir.1991):

Federal common law controls the interpretation of insurance policies issued pursuant to the National Flood Insurance Program. (NFIP). *See, e.g., Sodowski v. National Flood Ins. Program,* 834 F.2d 653, 655 (7th Cir.1987). In considering coverage questions arising under the NFIP, federal courts have recognized that, because potential exposure to claims and premium rates are estimated by FEMA in accordance with standard insurance practices, "Congress did not intend to abrogate standard insurance law principles which affect such estimates and risks." *Drewett v. Aetna*

Cas. & Sur. Co., 539 F.2d 496, 498 (5th Cir.1976); Sodowski, 834 F.2d at 655. Id. at 529–530.[7] Thus, although federal common law controls policy interpretation, to the extent the court must rely upon standard insurance principles to assist in the interpretation, it must find those principles somewhere, presumably in state common law.

## Plaintiff's claims

Plaintiff's claims against the Agency for misrepresentation and negligence have been resolved; however, his claim against the Company for negligence remains. Plaintiff contends that the Company was negligent in that it breached its duty to give notice to plaintiff of the decrease or deletion in policy coverage. Plaintiff claims damages in the amount of $185,000 as a proximate result of the Company's negligence.

The parties arguments suggest that plaintiff's success on his claim depends entirely on whether the Company is properly treated as a private insurer whose conduct is governed by state insurance law principles or as an arm of the federal government governed by federal common law. In support of the latter position, the Company cites Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

The Merrill case is in many respects similar to the case at hand. In Merrill, the insurance program at issue was crop insurance, an enterprise undertaken by the federal government because the private insurance industry had failed to provide such insurance on an economically feasible basis. Id. at 383 n. 1, 68 S.Ct. 1. A local agricultural conservation committee, acting as agent for the Federal Crop Insurance Corporation informed the Merrill partners that their entire 460 acre wheat crop was insurable. Id. at 382, 68 S.Ct. 1. Actually, the crop on 400 of the 460 acres was not insurable because that amount was reseeded on winter wheat acreage. Id. The Merrill partners lost most of their crop to drought and, accordingly, sought insurance benefits. Id.

The Supreme Court reversed the state court decisions which awarded the Merrill partners insurance benefits based on the representations of the Federal Crop Insurance Corporation's agent. The lower courts had concluded that when the government took on an essentially private business function, such as providing insurance, its agent's representations would bind it the same way a private insurance company's agents representations would bind the private insurance company. The Court rejected that reasoning:

> The case no doubt presents phases of hardship. We take for granted that, on the basis of what they were told by the Corporation's local agent, the respondents reasonably believed that their entire crop was covered by petitioner's insurance. And so we assume that recovery could be had against a private insurance company. But the Corporation is not a private insurance company. It is too late in the day to urge that the Government is just another private litigant, for purposes of charging it with liability, whenever it takes over a business theretofore conducted by private enterprise or engages in competition with private ventures. Government is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity

7. Linder & Associates, Inc. v. Aetna Cas. & Sur. Co., 166 F.3d 547 (3rd Cir.1999), Berger I, 933 F.2d at 397; Seattle Fur Exchange, Inc. v. Foreign Credit Ins. Ass'n, 7 F.3d 158, 160– 161 (9th Cir.1993); Carneiro Da Cunha v. Standard Fire Ins. Co., 129 F.3d 581 (11th Cir.1997).

or the manner in which the Government conducts it. The Government may carry on its operations through conventional executive agencies or through corporate forms especially created for defined ends. *See Keifer & Keifer v. Reconstruction Finance Corp.*, 306 U.S. 381, 390, 59 S.Ct. 516, 518, 83 L.Ed. 784. Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that ·he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority. *See, e.g., Utah Power & Light Co. v. United States*, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791; *United States v. Stewart*, 311 U.S. 60, 70, 61 S.Ct. 102, 108, 85 L.Ed. 40, *and see, generally, In re Floyd Acceptances*, 74 U.S. 666, 7 Wall. 666, 19 L.Ed. 169. If the Federal Crop Insurance Act had by explicit language prohibited the insurance of spring wheat which is reseeded on winter wheat acreage, the ignorance of such a restriction, either by the respondents or the Corporation's agent, would be immaterial and recovery could not be had against the Corporation for loss of such reseeded wheat. Congress could hardly define the multitudinous details appropriate for the business of crop insurance when the Government entered it. Inevitably 'the terms and conditions' upon which valid governmental insurance can be had must be defined by the agency acting for the Government. And so Congress has legislated in this instance, as in modern regulatory enactments it so often does by conferring the rule-making power upon the agency created for carrying out its policy. *See* § 516(b), 52 Stat. 72, 77, 7 U.S.C. s 1516(b), 7 U.S.C.A. § 1516(b). Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents. 49 Stat. 502, 44 U.S.C. § 307, 44 U.S.C.A. § 307.

Accordingly, the Wheat Crop Insurance Regulations were binding on all who sought to come within the Federal Crop Insurance Act, regardless of actual knowledge of what is in the Regulations or of the hardship resulting from innocent ignorance. The oft-quoted observation in *Rock Island, Arkansas & Louisiana R. Co. v. United States*, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188, that 'Men must turn square corners when they deal with the Government,' does not reflect a callous outlook. It merely expresses the duty of all courts to observe the conditions defined by Congress for charging the public treasury. The 'terms and conditions' defined by the Corporation, under authority of Congress, for creating liability on the part of the Government preclude recovery for the loss of the reseeded wheat no matter with what good reason the respondents thought they had obtained insurance from the Government.

*Merrill,* 332 U.S. at 383–385, 68 S.Ct. 1.

It is impossible to ignore the parallels between the *Merrill* case and the instant case. Indeed, in many respects, the instant facts provide a stronger case for dismissal than did the *Merrill* fact situation. In *Merrill,* the government's agent made affirmative misrepresentations to the insured regarding the nature of coverage. Here, the agent simply failed to tell the insured of a change in the available coverage. In *Merrill,* the terms of coverage

which precluded recovery were contained in regulations promulgated by the agency. Here, the terms which precluded recovery were specifically defined by Congress in a statute.

Despite the similarities between the two cases, plaintiff contends that *Merrill* is distinguishable. Specifically, plaintiff argues that the Company is a private insurer not the government; accordingly, standard insurance principles should govern. These principles include the following:

> [T]he law in Michigan places a duty upon an insured to read the policy and air any discrepancies in coverage within a reasonable time after issuance of the policy. [citations omitted]. However, this rule does not apply when a renewal policy is issued without calling the insured's attention to a reduction in coverage, as the insurer in those circumstances is bound by the greater coverage in the earlier policy.

*J.C. Wyckoff & Assoc., Inc. v. Standard Fire Ins. Co.,* 936 F.2d 1474, 1494 (6th Cir.1991).[8]

At least one federal district court has accepted plaintiff's argument. In *Taylor v. Omaha Property and Casualty Ins. Co.,* 739 F.Supp. 1069 (E.D.Va.1990), the plaintiffs performed certain repairs to their home which was covered by flood insurance. The nature of their coverage changed at some point, such that if an earlier policy governed, the costs of the repairs would be covered, but if a later policy governed, the costs of the repairs would not be covered. The insurer never notified the Taylors of the change in coverage.

Even though the coverage change appeared in the Federal Register, the district court concluded that the insureds did not have notice of the change and that *Merrill* did not apply because the insurer was not a federal agency. *Taylor,* 739 F.Supp. at 1071. Instead, the district court turned to the standard insurance principles that plaintiff here claims should govern: " 'Where an insurance company purports to issue a policy as a renewal policy without fairly calling the insured's attention to a reduction in the policy coverage, it remains bound by any greater coverage in the earlier policy.' " *Id.* at 1072. Accordingly, the district court entered judgment compelling the insurance company to pay the repair costs. In making its decision, the district court acknowledged that it had not considered the relationship between FEMA and the insurer. *Id.* at 1073.

The *Taylor* court's failure to consider the relationship between the insurer and FEMA limits the persuasive force of the *Taylor* decision. In *Spence v. Omaha Indemnity Ins. Co.,* 996 F.2d 793 (5th Cir. 1993), however, the Fifth Circuit took the analysis one step further. The court looked at the relationship between the federal agency and the insurance company yet it still concluded that *Merrill* should not preclude the insurance company's liability for fraudulently misrepresenting the scope of coverage afforded under the SFIP. The Fifth Circuit's analysis of the appropriate statute of limitations to apply to such a claim is instructive on the issue now before this court. The court stated:

> While the national policies underlying the NFIP and extensive federal role therein impel our conclusion that federal common law governs claims under flood insurance policies, the same does not apply in actions for tortious misrepre-

---

**8.** *See also American Casualty Co. v. Federal Deposit Insurance Corp.,* 39 F.3d 633, 641 (6th Cir.1994); *Amway Distributors Benefits Ass'n v. Federal Insurance Co.,* 990 F.Supp. 936, 942 (W.D.Mich.1997); *American Casualty Co. v. Rahn,* 854 F.Supp. 492, 502 (W.D.Mich.1994).

sentation against WYO insurers. FEMA regulations accord substantial autonomy to WYO companies in SFIP marketing and claims adjustment, and expressly provide that "WYO Companies shall not be agents of the Federal Government." Further, while WYO insurers may draw on FEMA letters of credit to pay SFIP claims, the WYO–FEMA agreement does not permit such draws to cover a WYO company's liability for fraud.

*Spence,* 996 F.2d at 796 (footnotes omitted). The court's conclusion that liability for any damages for a state law tort claim would fall to the WYO company rather than the federal government is the key to its analysis. That conclusion, in turn, was based on the agency's regulations and the agreement between WYO carriers and FEMA:

> That agreement, which FEMA has incorporated into regulations governing the NFIP, *see* 44 C.F.R. § 62.23(a), permits reimbursement of WYO companies for "payments as a result of awards or judgments for damages arising under the scope of this Arrangement, policies of flood insurance issued pursuant to this Arrangement, and the claims processing standards and guides set forth at Article II, Section A, 2.0 of this Arrangement." 44 C.F.R. Pt. 62 App. A, Art III Section D(2). It also calls for reimbursement of loss adjustment expenses and premium refunds. 44 C.F.R. Pt. 62, App. A, Art. III Secs. (C)(E). These provisions plainly do not contem-

plate reimbursement for judgments on tort claims such as those asserted by the Spences. *See also* 42 U.S.C. § 4081(c) ("The Director of the Federal Emergency Management Agency may not hold harmless or indemnify an agent or broker for his or her error or omission."). *Id.* at 796 n. 17. Certainly, if it is true that the monies to pay any judgment are not paid from public funds, the rationale underlying the *Merrill* decision would appear to be inapplicable.[9]

Not every federal court to consider the issue has concurred with the *Spence* court's conclusion that public funds are not at issue in a tort action against a WYO insurer. In *Van Holt,* 163 F.3d at 161, the Third Circuit analyzed a jurisdictional issue and concluded public funds are at issue in a tort action against a WYO insurer:

> Although the Van Holts' suit does not explicitly allege that Liberty Mutual violated the insurance policy contract, their lawsuit should be deemed an action subject to the Act. The statutory and regulatory scheme reveals that Congress would have intended to give the district court original exclusive jurisdiction had Congress considered the issue. Most importantly, federal funds are at stake in this suit. Congress would want federal courts to adjudicate disputes over federal flood insurance policies for which the federal government would be responsible for reimbursing the WYO company if the claimant prevails. Al-

---

**9.** Other courts have reached conclusions similar to that reached by the Fifth Circuit in *Spence. See, i.e., Conrad v. Omaha Property and Casualty Ins. Co.,* No. Civ. A. 94–4087, 1995 WL 350418, *3 (E.D.Pa. June 7, 1995); ("The WYO company and not the government is the real party in interest. The WYO is solely liable for the coverage the standard policy provides and the WYO company is not the agent of the government. No judgment that a court might enter would obligate the government to reimburse the WYO company

for a claim the private issuer was ordered to pay."); *Lakewood Apartments Associates, L.P. v. Proctor Homer Warren, Inc.,* No. Civ. A. 95–4285, 1996 WL 227837 *3 n. 13 (E.D.La. 1996) ("FEMA regulations ... indicate an intent to leave those [WYO] insurers responsible for their own tortious conduct."); *see also Penny v. Giuffrida,* 897 F.2d 1543 (10th Cir. 1990) (Where negligence judgments against the WYO insurer and agency were permitted to stand although the claim against FEMA was reversed on *Merrill* grounds.).

though the Van Holts' claims sound in tort, their causes of action alleging impropriety in the investigation and adjustment of their insurance claim are intimately related to the disallowance of their insurance claim. Despite our initial conclusion that the NFIA's policies and regulations did not evince a Congressional intent to provide original exclusive jurisdiction of state-law torts arising out of flood insurance policies, the briefs we received in connection with the petition of rehearing have enhanced our understanding of the flood insurance program. We now determine that Congress, had it considered the specific question, would have intended to confer original exclusive jurisdiction on the district court over claims sounding in tort arising out of the investigation or adjustment of insurance policies arising out of the administration and sale of insurance under the NFIA. We reach this conclusion because Liberty Mutual is a fiscal agent of the United States, FEMA would have borne the costs of the plaintiffs' insurance claim, and FEMA is obliged to reimburse Liberty Mutual for defense costs.

*Van Holt*, 163 F.3d at 167.

■ To the extent public funds are at issue in a state law tort claim against a WYO insurer, as suggested in *Van Holt*, represented by the Company's counsel at oral argument, and not refuted by either the Agency or plaintiff, the court finds that *Merrill* would preclude the recovery sought by plaintiff and the Company's motion for summary judgment would be properly granted. If, on the other hand, public funds are not at issue, as suggested in *Spence, Conrad, Lakewood Apartments,*

and *Penny,* the reasoning underlying *Merrill* would be inapplicable. In that instance, state common law principles would provide the framework for proper resolution of plaintiff's claim.

■ Even if public funds were not at issue in a state law tort claim against a WYO insurer, the entry of summary judgment in favor of the Company on plaintiff's claim would still be appropriate. As noted above, under state law, where a decrease in coverage by way of a renewal policy has not properly been brought to the attention of an insured, the insured is entitled to the greater coverage afforded under the initial policy.[10] The "greater coverage" of the initial policy in this instance, however, would still afford plaintiff no relief.

If Congress had not deleted Upton–Jones coverage by way of repeal, it would have expired anyway by virtue of the sunset date. The difference in coverage under the "pre-repeal" and "post-repeal" policies amounted to seven days of coverage between September 23 and September 30, 1995. Had plaintiff filed a claim within this seven-day window, the renewal principle might operate to his benefit. Plaintiff did not do so.

■ It must be noted that the renewal principle presumes that the insured has knowledge of the terms and conditions of the initial policy, whether or not he has read that policy. *See* cases cited in note 8, *infra.* That presumption, in turn, appears to be based on a presumption that the insurer has delivered the policy to the insured. *House v. Billman,* 340 Mich. 621, 66 N.W.2d 213, 216 (1954). In this instance, there is no evidence that the Company or the Agency ever delivered the

---

**10.** This principle shall be referenced herein as the "renewal principle." It is important to keep in mind that the decrease in coverage here was not accomplished by way of a renewal policy affording less coverage. Instead, it is the product of Congressional action repealing Upton–Jones coverage. It is merely coincidental that the repeal occurred at approximately the same time that plaintiff renewed his coverage during the fall of 1994.

policy to the plaintiff. The absence of delivery of the policy is immaterial, however, because (1) the SFIP never included the terms of Upton–Jones coverage, it was only generally incorporated by reference, thus reading the policy would have indicated nothing regarding Upton–Jones coverage; and (2) the Agency did deliver a copy of the Upton–Jones Amendment, which included the sunset date, to plaintiff. In short, despite the unusual nature of the subject flood insurance transactions (i.e., no renewal change in coverage and no policy to be changed), the renewal principle offers plaintiff no relief.

Even if the court looks beyond the renewal principle argued by plaintiff to a traditional common law negligence analysis, plaintiff's claim necessarily fails. "To successfully establish a cause of action for negligence under Michigan law, a plaintiff must show that (1) the defendant owed a legal duty to the plaintiff, (2) the defendant breached that duty, (3) the defendant's breach was the proximate cause of the plaintiff's injuries, and (4) the plaintiff suffered damage." *Naumer v. Equity Residential Properties Management Limited Partnership,* No. 97–1671, 1998 WL 449670, *2 (6th Cir. July 20, 1998) citing *Clark v. Dalman,* 379 Mich. 251, 150 N.W.2d 755, 759 (Mich.1967).[11] In this instance, even if plaintiff were able to establish the existence of a duty on the part of the Company to keep plaintiff informed of the repeal of the Upton–Jones Amendment, and even if plaintiff could establish a breach of that duty, he could not establish that his damages were proximately caused by the breach of that duty.

■ As a matter of federal law, a person is charged with knowledge of the content of Statutes at Large. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Without question, the imputation of knowledge by virtue of publication in the Statutes at Large "is something of a fiction . . . [;]" however, it is a fiction "required in any system of law[.]" *United States v. R.L.C.,* 503 U.S. 291, 308, 112 S.Ct. 1329, 117 L.Ed.2d 559 (1992) (concurring opinion of J. Scalia). Applying that fiction here, plaintiff had constructive notice of the repeal of Upton–Jones coverage and, thus, cannot claim that the Company's failure to inform him of the repeal caused him damage.

■ Alternatively, plaintiff cannot establish that the Company's failure to inform him of the repeal proximately caused his damage where plaintiff failed to file his Upton–Jones claim before September 30, 1995, the date Upton–Jones coverage expired without regard to the repeal.

Finally, although perhaps not dispositive of the proximate cause issue, it is difficult to ignore the fact that, with or without Upton–Jones coverage, plaintiff was in a position to get the full benefit of the policy under the SFIP erosion coverage once his house fell into the lake. There can be no dispute that plaintiff wanted to enjoy his home until the last minute. He wanted to, in his words, "ride it over." The evidence demonstrates that plaintiff never intended to file an Upton–Jones claim; instead, he intended to file an erosion claim under the SFIP if and when his home fell into the lake.

Despite plaintiff's knowledge that he could pursue an Upton–Jones claim, probably beginning shortly after he purchased the home, he never filed such a claim.

---

**11.** The federal courts applying Michigan law have routinely determined that Michigan law requires demonstration of these four elements. *See Minni v. Emro Marketing Co.,* No. 96–1898, 1997 WL 359073 (6th Cir. June 26, 1997); *Carll v. Ware,* No. 1:96–CV–173, 1997 WL 269489 (W.D.Mich. April 14, 1997); *Musser v. AT & T Corp.,* No. 1:94–CV–521, 1996 WL 42034 (W.D.Mich. January 3, 1996).

Plaintiff did not discover the repeal by filing an Upton–Jones claim and having it denied; rather, his insurance agent told him of the repeal in the summer of 1996. Until that time he had never filed a claim and shortly after that time his house fell into the lake. Although plaintiff apparently believed the repeal of Upton–Jones was the repeal of erosion coverage, he was wrong. When plaintiff's house fell into the lake, he could have simply filed a claim seeking benefits for his erosion losses. He did not do so until it was too late.

■■■ As discussed in detail above, the only difference between Upton–Jones coverage and SFIP erosion coverage is one of timing. Both types of coverage require that erosion or undermining caused by waves or currents of water exceeding anticipated cyclical levels cause the loss, either by actual collapse for SFIP erosion coverage or imminent collapse for Upton–Jones coverage. If the Company had informed plaintiff of the repeal on September 23, 1994 (the first date the Company could possibly have informed plaintiff of the repeal of Upton–Jones), plaintiff would have had until September 23, 1995, to file his claim. The lake levels for each month during that period are set forth in Exhibit L to the Agency's brief in response to the Company's motion for summary judgment.[12] The lake level preceding and during March of 1997, the date plaintiff's home actually began to fall into the lake, are also reflected in the table.

Whether one defines "anticipated lake levels" using 1973 as the base year or the mean level over many decades, *see Berger II*, plaintiff is put in no worse position by virtue of relying on 1997 lake levels when the home collapsed than he would have been had he relied on lake levels from September 1994 to September 1995, when he would have had to argue such collapse was imminent. To the contrary, plaintiff's position that lake levels exceeded expectation is far stronger in 1997.[13]

Plaintiff got exactly what he wanted. He lived in a lakefront home for years, as long as he possibly could, knowing it would eventually fall into the lake. Once it fell in he had an insurance policy that covered his loss. He simply failed to file his claim on time. Under these circumstances, no reasonable juror could conclude that plaintiff's claimed damages ($185,000) were proximately caused by the Company's failure to tell plaintiff of the repeal of Upton–Jones coverage.

■■■ The Agency's negligence claim against the Company fails for the same reason that plaintiff's negligence claim failed: either *Merrill* effectively precludes the claim because federal funds are at stake or the Agency cannot establish that the Company's failure to inform the Agency of the repeal of Upton–Jones was the proximate cause of damage to the Agency.

■■■ The Agency also claims that the Company should have paid the SFIP erosion claim submitted by plaintiff. The Agency does not have standing to raise this claim. In *Ryan v. Collucio*, 183 F.R.D. 420 (D.N.J.1998), homeowners suffered flood damage and sued their NFIP WYO insurer. The homeowners also sued

---

12. The attached document purports to be a table prepared by the Army Corps of Engineers reflecting monthly lake levels for several decades. The Agency failed to comply with Rule 56(e) requiring that such documents be sworn or certified. The court would not normally consider such hearsay evidence. *See Wiley v. United States*, 20 F.3d 222, 225 (6th Cir.1994). In this instance, however, no party has objected to the document; therefore, any objections are waived. *Id.; see also Moore v. Holbrook*, 2 F.3d 697 (6th Cir.1993).

13. Indeed, for two of the months in 1995, lake levels were equal to or fell short of expectation.

the prior owners for fraud and negligence. The prior owners attempted to raise claims against the WYO insurer claiming that it should have covered the plaintiff's damages under the SFIP. The court described the standing requirement:

> It is axiomatic that a plaintiff must have standing to sue in order to present a justiciable case or controversy to the court. *See Gariano v. CSC Ins. Co.,* 845 F.Supp. 1074, 1077 (D.N.J.1994) (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471–72, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). To have standing "a plaintiff must have personally suffered some actual or threatened injury as a result of a defendant's alleged unlawful conduct." *Gariano,* 845 F.Supp. at 1077 (citing *Valley Forge,* 454 U.S. at 472, 102 S.Ct. 752). Furthermore, "a plaintiff must be asserting his own legal rights in a case, not those of third parties." *Gariano,* 845 F.Supp. at 1077 (citing *Gladstone Realtors v. Bellwood,* 441 U.S. 91, 99–100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)). "Finally, a plaintiff's interest must be within the 'zone of interests' protected by the law from which the claim arises." *Id.*

*Ryan* at 422–423. The court concluded that no reported authority could support the proposition that "a party, such as [the prior owner], who may be liable due to his own negligence or fraudulent conduct to an insured under NFIA, is entitled to indemnification and/or contribution" based on the coverage provided by the flood insurance. *Id.* at 423.

Even assuming the Agency had standing to pursue this claim, it could not prevail because plaintiff failed to timely file a proof of loss. Consistent with *Merrill,* the federal courts have consistently determined that the proof of loss requirement is to be strictly enforced.[14] It is undisputed that plaintiff failed to comply with the requirement in this instance; accordingly, coverage is not available. The Agency's claim on the policy is, therefore, properly dismissed.

### Conclusion

For the reasons set forth above, the Company's motions for summary judgment as to plaintiff's claim and the Agency's claims are properly GRANTED.

---

**14.** *See, i.e., Gowland v. Aetna,* 143 F.3d 951 (5th Cir.1998); *Oppenheim v. Director Federal Emergency Management Agency,* No. 86–6357, 1988 WL 69785 (9th Cir. Jun 22, 1988); *Phelps v. Federal Emergency Management Agency,* 785 F.2d 13 (1st Cir.1986); *West Augusta Development Corp. v. Giuffrida,* 717 F.2d 139 (4th Cir.1983). Although some courts have estopped either the WYO carrier or the government from asserting the proof of loss requirement as a defense in the case of affirmative misconduct, none have overlooked the proof of loss requirement in circumstances similar to those presented here.